No. 27,286.

A. J. BELLPORT, JR., *Appellee*, v. W. B. HARRISON and J. W. CRAIG,
*Appellants*.

SYLLABUS BY THE COURT.

1. MINES AND MINERALS—*Oil and Gas Leases—"Royalty" Legally Defined.* The
ordinary and legal meaning of the word "royalty," as applied to an existing
oil and gas lease, is the compensation provided in the lease for the privilege
of drilling and producing oil and gas, and consists of a share in the oil and
gas produced. It does not include a perpetual interest in the oil and gas in
the ground.

2. CUSTOMS AND USAGES—*Application to Oil and Gas Leases—Enlarging Mean-
ing of Word "Royalty."* The ordinary meaning of the word "royalty" in an
existing oil and gas lease cannot be enlarged by proof of usage and custom
so as to include a conveyance of oil and gas in place in the land and the
perpetual right to go upon the premises to explore for and produce oil and
gas.

Appeal from Sedgwick district court; THORNTON W. SARGENT, judge. Opin-
ion filed April 9, 1927. Reversed.

*C. H. Brooks, Willard Brooks* and *Howard T. Fleeson,* all of Wichita, for the
appellants.

*J. Graham Campbell* and *Ray Campbell,* both of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action by the purchaser to rescind a con-
tract for the purchase of a "1/16 royalty" in certain land because of
the nonperformance of such contract on the part of the sellers, and
to recover the money paid, with interest. It was tried to the court
and jury, special questions were answered, and plaintiff recovered
the full amount claimed. Defendants have appealed.

Briefly, the facts shown by the record are substantially as fol-
lows: The defendants, W. B. Harrison and J. W. Craig, were the
owners of the southwest quarter of a certain section in Sedgwick
county. There was an existing oil and gas lease on the east one-half
and the northwest quarter of this land, and the Empire Drilling
Company was drilling a well on the east half of the quarter sec-
tion. There was also an oil and gas lease on the southwest quarter
of the quarter section, which lease was not then being developed.

Cancellation of Instruments, 9 C. J. pp. 1181 n. 79, 1182 n. 85. Customs and
Usages, 17 C. J. pp. 467 n. 60, 471 n. 70, 508 n. 46, 523 n. 64. Mines and Min-
erals, 40 C. J. p. 1102 n. 24.

On April 20, 1921, plaintiff had a conversation with the defendant Harrison about a royalty on the west half of the quarter section. They talked about the leases then in force on the land, and Harrison stated he had retained the customary one-eighth royalty. Plaintiff asked Harrison what he would take for one-half of his royalty, and Harrison quoted the price at $2,400. Plaintiff said he would purchase it, and gave Harrison his check for $2,400 and received from him the following written memorandum:

"Received of A. J. Bellport, $2,400, payment for $\frac{1}{16}$ royalty on west $\frac{1}{2}$ of southwest $\frac{1}{4}$ section 33, township 26, range 2 east, Sedgwick county, Kansas, title to be delivered as soon as papers are completed.

(Signed)    W. B. Harrison and J. W. Craig,<br>. By W. B. Harrison.

Wichita, Kansas, 4-20-1921."

Plaintiff took this to his attorneys, told them of the transaction, authorized them to examine and pass upon the abstract of title to the real property, and to see that the papers were executed and delivered necessary to assign to him the royalty purchased. Defendants also turned the matter over to their attorneys to have the abstract of title to the land completed and to prepare for their execution papers necessary for the assignment of the royalty sold. The abstract was brought to date, presented to plaintiff's attorneys, and by them approved.

Counsel for defendants prepared a typewritten form of assignment, reciting the two leases on the property and conveying an undivided one-half interest in and to the royalties mentioned in such leases. This assignment was duly executed and acknowledged by defendants and presented to counsel for plaintiff, who declined to accept it on behalf of the plaintiff. Counsel for plaintiff prepared an instrument which conveyed an undivided one-half interest in all the oil and gas, etc., lying under the land described, also a half interest in the grantor's rights under leases now or hereafter existing, including all rents and royalties accrued and to accrue, a perpetual right to go upon the premises to drill wells and produce oil, etc., the grantor to be entitled to share half on paying half of the expenses, to the same extent as though the grantee were the absolute owner of half of the land. Counsel for defendants objected to the form of the instrument and declined to recommend that defendants execute it. Counsel for the parties had several conferences concerning the matter, in each of which counsel for defendants contended that all his clients were required to assign was the royalties

under existing leases, while counsel for plaintiff contended that in addition to that he should have an instrument which conveyed one-half of all the oil and gas in place, royalties and bonuses which might accrue or become payable on future leases, and the perpetual right to go upon the premises and explore for oil and gas, the grantors to have one-half of the proceeds upon paying one-half of the expenses. About the middle of June the well which was being drilled by the Empire company on the east half of the quarter section came in a dry well. It had been drilled to a depth of about 3,000 feet, which was the depth the drillers had contracted to drill. After this there appears to have been but little, if anything, said with reference to any assignment of the royalties from defendants to plaintiff for more than three years and until about August 26, 1924. Plaintiff and his attorney then went to the defendant Harrison to talk about an assignment of the royalty. Harrison said he supposed the matter had been abandoned when the well came in dry; that the oil and gas leases on the land at that time had expired and been released, and that defendants had sold the land. Plaintiff, through his counsel, insisted that he should have an assignment, and Harrison said he would see what he could do about it. There were two or three conferences and some correspondence concerning the matter, extending over several months, and some effort was made to get the then owner of the land to execute the kind of conveyance plaintiff desired, but he declined to do so, at least none was executed. This action was brought January 28, 1925.

It was the position of the plaintiff in the court below, and is here, that a custom existed in the oil fields of southern Kansas, including Wichita, by which the ordinary meaning of the word "royalty" was enlarged so as to include one-half of the oil and gas or other minerals lying in the land in place, the right to bonuses and royalties from existing and future leases, and the perpetual right of the owner of such royalty to go upon the land and explore for and produce such oil, gas and other minerals. The court instructed the jury:

"That the ordinary and legal meaning of the word royalty as applied to the oil and gas business, *independently of any custom existing on the subject,* is that a royalty is the compensation provided in oil and gas leases for the privilege of drilling for oil and gas, and consists of a share in the oil and gas produced under existing leases, but a royalty interest does not consist of a perpetual interest in the oil or gas as they lie in the ground. On the expiration of the existing leases the right of the owner of the royalty expires. If, therefore, you find that there was no such custom as is contended for by Bell-

port and as set forth in instruction 5, you are instructed that Bellport's interest in the land was only such as is defined in this instruction, and that since the leases have expired his interest in the land has terminated and your verdict should be for the defendants."

No complaint is made of this instruction, in so far as it gives the ordinary meaning of the word "royalty." It appears to accord with the authorities. (*Robinson v. Jones,* 119 Kan. 609, 240 Pac. 957; *Miller v. Sooy,* 120 Kan. 81, 242 Pac. 140; *Hinerman v. Baldwin et al.,* 67 Mont. 417; *Indiana, etc., Oil Co. v. Stewart,* 45 Ind. App. 554; *Raynolds v. Hanna,* 55 Fed. 783, 800; *Burke Hollow Coal Company v. Lawson,* 151 Ky. 305; *Kissick v. Bolton,* 134 Ia. 650.)

The first legal question presented is whether, in view of the fact that the word "royalty" used in the written memorandum has a well-known meaning, such meaning can be enlarged, as contended for by plaintiff, by showing a custom. The answer must be in the negative. In *McSherry v. Blanchfield,* 68 Kan. 310, 75 Pac. 121, it was held:

"The proper office of usage or custom is to explain technical terms in contracts to which peculiar meanings attach; to make certain that which is indefinite, ambiguous or obscure; to supply necessary matters upon which the contract itself is silent; and generally to elucidate the intention of the parties when the meaning of the contract cannot be clearly ascertained from the language employed." (Syl. ¶ 3.)

In *Atkinson v. Kirkpatrick,* 90 Kan. 515, 135 Pac. 579, a written lease for a store building made no provision with respect to which party should pay for water, but the answer alleged, and the jury found, that a custom generally known and acquiesced in prevailed in Arkansas City by which, in the absence of any agreement, the landlord pays for water furnished the tenant in case of such a lease. It was held:

"That the existence of the alleged usage or custom could impose no liability upon the landlord, nor could it create a contract where the parties have made none, and that proof of such usage is not admissible where the terms of the written lease are clear and unambiguous." (Syl. ¶ 5.)

In *Strong v. Ringle,* 96 Kan. 573, 576, it was said:

"The general function of usage and custom is definition, explanation, elucidation. Whenever the matter is clear there is no function to be performed."

In *Commission Co. v. Mowery,* 99 Kan. 389, 161 Pac. 634, 162 Pac. 313, it was held:

"Ordinarily custom and usage are admissible merely to explain or elucidate something uncertain or ambiguous contained in a contract." (Syl. ¶ 2.)

And in the opinion it was said:

"The contract evidenced by these telegrams is free from uncertainty or ambiguity and hence . . . there was no room for usage or custom to operate." (p. 396.)

In *Eckhardt v. Taylor,* 90 Kan. 698, 136 Pac. 218, the lease contained an agreement on the part of the defendants to "keep in good repair all fences surrounding said farm lands and all buildings except the general wear and damage by elements." There was evidence of a local custom for those handling cattle to "ride the fences," carrying "staples and a hammer and the necessary tools for repairing a fence." It was said:

"The provision of the lease regarding the keeping up of the fence was not ambiguous, and, within the authority of a case recently decided by this court, could not be affected by evidence of a local custom." (p. 701.)

In *Henderson v. Petroleum Co.,* 104 Kan. 653, 180 Pac. 228, the syllabus reads:

"In an action to recover for the value of well-drilling tools which were destroyed by fire, it was shown that plaintiffs agreed to drill an oil and gas well for the defendant and were to receive $1.75 a foot, and $60 a day for day work, which included underreaming, pulling the pipes, cleaning out, and work of that kind. Nothing was said about the responsibility of either party for losses of tools by fire or otherwise. *Held,* that in such an action it is incompetent to prove an alleged general usage and local custom throughout the oil fields of Kansas that when drillers are working for and under the direction of the owner of the well being drilled, the latter is responsible for losses of the drillers' tools resulting from fires."

In *Manufacturing Co. v. Merriam,* 104 Kan. 646, 180 Pac. 224, the requisites of a custom are stated, also the character of the evidence necessary to establish it. It was held the evidence was insufficient to establish the existence of a custom in the oil fields for dealers in wire cables to make adjustments to purchasers of defective cables sold without warranty.

The instrument prepared by plaintiff's counsel, and which he insisted should be executed by defendants, is more than an assignment of royalty, within the usual and ordinary meaning of that word. It is (1) an assignment of royalties (a) under existing leases and (b) future leases; (2) a conveyance of one-half of the minerals in place in the land, and (3) a perpetual oil and gas lease, granting to the assignee or grantee, at any or all times in the future, to enter upon the premises and explore for oil, gas or other minerals and produce and market them if found, the grantor to have a share of such min-

erals produced in the event only that he had paid one-half of the expense. To enlarge the ordinary meaning of the word "royalty" by proof of a usage or custom so as to require these additional conveyances and obligations of the assignor, is so unreasonable as not to be entertained. Generally speaking, the law is not like a costume, to be put on or taken off in conformity to the dictates of usage and custom. (*Clark v. Allaman,* 71 Kan. 206, 231, 80 Pac. 571.) The usage and custom relied upon must not be in opposition to well-settled principles of law, nor unreasonable. (*Smythe v. Parsons,* 37 Kan. 79, 14 Pac. 444.)

Here the written memorandum used the word "royalty" in a sense that is perfectly intelligible, having a definite legal meaning. It was not ambiguous. It was not open to explanation or enlargement of meaning by proof of custom. There is no controversy in this case as to the meaning of the fraction one-sixteenth. It is one-half of the land owners' one-eighth provided for in the lease.

It is not necessary to examine the evidence to see if it supports the findings of the jury of the existence of the custom contended for by the plaintiff. Well-informed, reliable witnesses testified to the existence of such custom; other witnesses, evidently just as well informed and as reliable, stated that no such custom existed. Reading the record, at least, it can hardly be said that the custom was established by that degree of proof required by the rule stated in *Manufacturing Co. v. Merriam,* 104 Kan. 646, 180 Pac. 224. When the parties made their deal they talked of nothing but the existing leases, their form and the one-eighth royalty reserved in them, and from their talk at the time it would seem that they had nothing else in mind. But in view of the conclusion already reached we shall not go further into the evidence.

Appellants contend that plaintiff could not, under the facts disclosed by this record, maintain this action as one for rescission for nonperformance. The ordinary remedy for nonperformance is an action for specific performance, or for damages. There are situations in which rescission is proper (9 C. J. 1181 *et seq.*). But whether rescission is a proper remedy need not be decided in this case in view of the conclusion heretofore reached. Neither is it necessary to decide the question argued as to the statute of limitations.

The judgment of the court below is reversed, with directions to enter judgment for defendants.