## SALLIE MULLINS v. J. J. EVANS et al.—308 S. W. (2d) 494, 68 A.L.R.(2d) 723.

Eastern Section. August 19, 1957.

Petition for Certiorari Denied by Supreme Court December 6, 1957.

J. R. Ketron, Tazewell, Harry B. Brown, Jellico, and Joe M. Agee, La Follette, for appellants.

John P. Davis, Tazewell, for appellee.

McAMIS, P. J. The primary question in this case is whether royalties for the mining of coal, accruing after the death of the lessor, pass as realty to the heirs at law of the lessor or as personalty to the surviving husband. The Chancellor determined the question in favor of the heirs at law and the husband, J. J. Evans, having died and the cause properly revived, his executors appeal. The administrator, C. T. A., of W. H. Teague, deceased, who was sued as trustee under the trust instrument hereinafter mentioned also appeals.

The original bill was filed by Sallie Teague Mullins, a sister of Mary J. Evans, the deceased wife of J. J. Evans, against J. J. Evans individually and as executor of W. H. Teague to recover royalties paid by W. H. Teague, trustee, to J. J. Evans after the death of Mary J. Evans. J. J. Evans filed an answer and cross bill alleging that Teague, trustee, for a certain period of time, had improperly paid to cross defendant Sallie Mullins a portion of the royalties accruing after the death of Mary J. Evans. The cross bill sought a recovery of these royalties.

The insistence of J. J. Evans, rejected by the Chancellor, is that the execution of the trust instrument by Mary J. Evans and the subsequent execution of a lease

by the trustee effected an equitable conversion of the interest of Mary J. Evans from realty to personalty and that she had only an interest in a mining partnership which descended as personalty to him as surviving husband under T. C. A. sec. 31-201.

Lewis Teague, deceased, was the father of W. H. Teague, Mary J. Evans and complainant Sallie Mullins. On September 1, 1925, these children owned in their own right certain tracts of land adjoining lands of their father, and of J. J. Evans and G. W. Fortner. On that date all of these parties, including Lewis Teague, executed what is called a "pool agreement" by which they conveyed to W. H. Teague, trustee, all the unmined coal on their respective properties. The preamble to the trust instrument recites: "Said tracts of land adjoin and are valuable for their coal deposits, and it is deemed by the parties hereto to be to the best advantage of all that said several tracts be consolidated so that the same can be operated for coal mining purposes as a unit."

The trustee was expressly empowered, but was not required to lease these lands for coal mining purposes for such length of time and upon such terms and conditions as he might deem proper and, in event such lease should be executed, the accruing royalties were to be paid to the grantors according to the acreage owned by them, respectively, apparently without regard to which tract might, at any given time, be the source of the royalties. The trust instrument expressly states that the trustee should not have power to sell or encumber the trust property and that all of the trustors by unanimous agreement might revoke the trust and execute a valid conveyance of the property.

A short time after executing the trust, Lewis Teague died leaving as his heirs at law complainant, Mrs. Mullins, and W. H. Teague and Mary J. Evans. Thereafter and on December 2, 1929, W. H. Teague, Trustee, executed a mining lease to Tennessee Jellico Coal Company to run for a period of 50 years with the right to renew for an additional 50 years. The lease neither in express terms nor by implication confers upon the lessee the right to exhaust all of the coal deposits on the land. On the contrary, significantly, the lessee's rights are expressly limited "to the Jellico seam or bed of coal" and the "refusal" of other seams in event the lessor should "desire that same be worked or mined".

The mines were in operation at the date of the death of Mary J. Evans. For a short time thereafter the trustee paid the royalties which would have accrued to her, if living, to her husband, J. J. Evans, but later discontinued making payments to him and began paying the royalties to complainant. The amount paid to each is not in dispute. The royalties for coal mined before the death of Mrs. Evans is not involved.

The character of the right to receive future rents from realty and, particularly, whether it is personal property or realty was before the Supreme Court in Combs v. Combs, 131 Tenn. 66, 173 S. W. 441, wherein the widow of the lessor sought to subject notes for rents accruing after his death to the payment of her claim to a year's support. In rejecting the widow's insistence that, by accepting notes, the intestate had severed the rents from the reversion estate, the Court said:

"By the common law rents under a lease executed by the owner of the fee, so accruing after death, cannot be

said to be the goods, chattels, rights, or credits of the deceased, since they are incident to the reversion, and vest in their heir or devisee. In this state, as well as in many other states, this rule is in force; it being said in Smith v. Thomas, 14 Lea (82 Tenn.) 324, that there is nothing in our statutes changing the rights of the heir or devisee. Combs v. Young, 4 Yerg. (12 Tenn.) 218, 231, 26 Am. Dec. 225; Rowan v. Riley, 6 Baxt. (65 Tenn.), 67; note to Walsh v. Packard, 165 Mass. 189, 42 N. E. 577, 40 L. R. A., 321.'' See also Schmid v. Baum's Home of Flowers, Inc., 162 Tenn. 439, 37 S. W. (2d) 105, 75 A. L. R. 261, expressly holding that, unless severed from the reversion by some act of the lessor, rents accruing after his death are realty and not personalty.

■■ While it must be conceded that there are certain characteristics distinguishing rents from royalties, generally speaking, unless altered by contract, the rules of law which govern rights and liabilities as to rents also apply in cases growing out of mining leases. 58 C. J. S. Mines and Minerals, sec. 185, p. 396. Whether royalties accruing after the death of the lessor pass under the laws of descent and distribution as realty under the rule of Combs v. Combs, supra, is a question of first impression in Tennessee. Elsewhere, such authority as there is on the question seems to support the holding of the Chancellor that such royalties are deemed realty. This seems to us the sounder and better rule, at least, where the terms of the instrument under which the mining operations are to be conducted cannot reasonably be construed as a *sale* of the minerals in which case the royalties might well be treated as purchase money and consequently personal property.

A leading case on the question is Williamson v. Williamson, 223 Ky. 589, 4 S. W. (2d) 392, 393. That case involved the right of a widow of the lessor to subject to her claim for dower coal royalties accruing after the death of her husband who had executed a coal mining lease to run for a period of 30 years with a right to renew for an additional period of 30 years. After noting a diversity of opinion on the subject and the conflicting theories advanced and after reviewing a number of cases including cases from Pennsylvania where the question had been considered, the Court said:

"In those cases prior Pennsylvania opinions were reviewed, and it was held that the question as to whether there was an absolute grant of the minerals in place was one to be governed by the intention of the parties as gathered from the instrument creating the right, and many courts, including this one, hold to the theory that where the right, under the terms of the instrument creating it, does not confer the privilege to take the minerals to exhaustion, it is not a sale, but a lease, and that the surviving widow's rights to the royalty in such leases, executed before the husband's death, is to be governed accordingly. In such cases the reserved royalty is held to be in the nature of rents or profits for the use of the land of which the husband died seized for the purpose to which he devoted it before his death, and which rule applies in all cases where a lease for the purpose was executed by the deceased husband, whether or not mines were opened pursuant thereto at the time of his death * * *"

The Court concluded, notwithstanding certain language of the lease and the fact that it might run for as long

as 60 years, that there had not been a sale of the coal and the royalties constituted realty and not personalty within the meaning of the laws of descent and distribution. On the question of sale or lease see also Rist v. Toole County, 117 Mont. 426, 159 P. (2d) 340, 162 A. L. R. 409.

In the later case of McIntire's Adm'r v. Bond, 227 Ky. 607, 13 S. W. (2d) 772, 64 A. L. R. 630, the Court of Appeals of Kentucky directly held that royalties from oil and gas leases, unless severed from the reversion, pass with it upon the death of the lessor to his heirs at law. See also Williams' Adm'r v. Union Bank & Trust Company, 283 Ky. 644, 143 S. W. (2d) 297, 131 A. L. R. 1364, also involving oil and gas royalties, with annotation p. 1371.

Returning now to a construction of the lease here in question, we think it must be said, first, that it is in form a lease which negatives the idea of an intention to transfer title to the minerals and, secondly, that it cannot reasonably be construed as conferring the right to mine coal to the point of exhaustion but, as pointed out above, the right to mine is limited to the Jellico seam which is not specifically located and the lessee was given only "the refusal" of other seams. We must, therefore, conclude that unless the conveyance of the minerals to a trustee or the creation of a partnership effected a conversion the royalties passed to the heirs at law, as the Chancellor held.

█ The creation of a trust did not effect a conversion from realty to personalty but only converted the title and ownership of Mrs. Evans from legal to equitable. Instead of the owners acting for themselves they found it to their advantage to convey title to a trustee to act for

them in executing mining leases. It is to be remembered that the trust was revocable at the will of all the parties grantor and that the power to sell or encumber was expressly withheld from the trustee. Nor do we think the fact that the parties were to share in the income according to acreage rather than the source of the coal producing royalties at any given time affects the question. The reason for so providing no doubt was to avoid the inconveniences of frequent inspections underground and possible resulting disputes and controversies. We cannot see that it reflects upon the intention of the parties bearing on the question of conversion. (The provision that the trust could be revoked only by the unanimous consent of the parties was very probably designed to prevent either of them from withdrawing with his minerals intact after the minerals of others had been depleted or exhausted.)

■■ The intention of the parties is the polestar controlling the question of equitable conversion and we find nothing in the trust instrument from which such an intention may be inferred. It does not require, but only authorizes, the trustee to deal with the property and, as above stated, the power to sell or encumber is expressly withheld. Generally, under the maxim that equity will regard as done that which ought to be done, an equitable conversion is effected when, but only when, there comes into play an enforceable obligation to perform some act which would effect a change in the nature of the property. Cf. Lynch v. Burger, 26 Tenn. App. 120, 168 S. W. (2d) 487.

■■ There remains only the question of the partnership. Under the Uniform Partnership Act, T. C. A. sec.

61-106, the joint ownership of property or the sharing of gross returns "whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived" does not of itself establish a partnership. We find no other fact or circumstances supporting the theory of a partnership and the burden of proof being upon him who alleges the existence of a partnership, Badger v. Boyd, 16 Tenn. App. 629, 65 S. W. (2d) 601, the right to receive the royalties on this theory cannot be sustained.

Affirmed at the cost of appellants and remanded.

Hale and Howard, JJ., concur.