The FEDERAL LAND BANK OF
HOUSTON
v.
UNITED STATES.
No. 99–57.

United States Court of Claims.
Dec. 3, 1958.

randum filed by Commissioner Cowan of this court.

Plaintiff, the owner of the lands in question, on March 3, 1937, conveyed the said lands to Jake Weingarten and Morton Lazarous, reserving an undivided ⅟₁₆ non-participating royalty interest [1] in and to all of the oil, gas, and other minerals in and under certain land for a period of 20 years from and after March 3, 1937, and as long thereafter as the purchase money note given by the grantees to the grantor remained unpaid. The royalty interest which plaintiff reserved in said land under the above described deed was property. Waggoner Estate v. Wichita County, 273 U.S. 113, 47 S.Ct. 271, 71 L.Ed. 566; Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021.[2] The royalty interest which plaintiff reserved in said land under the deed terminated, and by the terms of said deed, reverted to the grantees, their heirs, and assigns, at 12:00 P. M., March 2, 1957.

By *mesne* conveyance of January 23, 1950, Grayson County, Texas, conveyed the land in question to the United States for the establishment thereon of the Perrin Air Force Base in Grayson County, Texas. The plaintiff never has relinquished or conveyed the royalty interest in minerals which it reserved, and the United States had constructive notice of plaintiff's ownership or interest in said land. The land in controversy has been under the exclusive domain of the defendant since January 23, 1950, and the surface of said land has been exclusively used by the Department of the Air Force since that date.

In June 1955 drilling operations were commenced on lands outside the air force base but adjoining the land in question. In August 1955 a producing well was completed on those lands and in the next

Ripley E. Woodard, Houston, Tex., for plaintiff. B. L. Templeton, Houston, Tex., was on the briefs.

Ralph S. Boyd, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

LARAMORE, Judge.

This is an action to recover just compensation for the claimed taking by the United States of a royalty interest owned by plaintiff in oil and gas in a parcel of land containing approximately 100 acres, which land was acquired for the Perrin Air Force Base, Grayson County, Texas.

The case arises on motions by plaintiff and defendant for summary judgment and presents these facts as disclosed by the petition, answer, and pre-trial memo-

[1.] A non-participating royalty may be defined as an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty, which does not carry with it the right to participate in the execution of, the bonus payable for, or the delay rentals to accrue under, oil, gas, and mineral leases executed by the owner of the mineral fee estate. Schlitter v. Smith, 128 Tex. 628, 101 S.W.2d 543.

[2.] This is conceded by the Government in its brief.

succeeding months other producing wells were completed on other adjacent lands.

During the period beginning June 9, 1955, and continuing until April 30, 1956, plaintiff tried to induce defendant to purchase its interest in the land, but was unsuccessful. On or about December 5, 1955, the Department of the Air Force initiated action to transfer jurisdiction over the mineral deposits in the land included within the Perrin Air Force Base (which included the lands in controversy) to the Department of the Interior, in order that the latter department might lease the land for mineral exploitation and thereby protect the interest of the United States against drainage of the oil and gas underlying the base by reason of commercially producing oil wells located outside the boundary of the Perrin Air Force Base.[3]

On or about May 4, 1956, jurisdiction over the mineral deposits within the base was transferred to the Department of the Interior.

Defendant knew on December 5, 1955, that some lands within the Perrin Air Force Base were potentially valuable for oil and gas. The lands within the base were first offered for oil and gas leasing on or about July 18, 1956, and said offer was withdrawn on August 29, 1956, for administrative reasons. A short time later another offer for leasing was made and Humble Oil and Refining Company was the only bidder. On October 31, 1956, Humble was awarded the lease. A lease was issued to Humble under date of December 1, 1956, covering, among other, the lands in question.

It was not until September 13, 1956, that the plaintiff made any demand upon the United States that the land be offered for oil and gas leasing.

Under the terms of the lease, Humble was required to commence drilling on the leased land within 60 days from December 1, 1956, and to drill and complete to production or abandonment three wells at locations specified in the lease. Drilling of each well subsequent to the first well was to be commenced within 30 days after completion of the preceding well.

The lessee commenced drilling prior to the expiration of the 60 days allowed and completed the first producing well on April 12, 1957. Since then several other producing wells have been completed on the lands in question. The wells on the lands leased by the Government have produced oil and gas in smaller quantities than those drilled on the adjoining lands.

On the basis of the above facts, plaintiff contends that its royalty interest in the lands was taken by the United States, because of the Government's failure to exercise its exclusive leasing rights to exploit the oil and gas deposits. As "just compensation" for the alleged taking of that interest, plaintiff claims an amount of money equal to the average production per acre on the adjoining lands for the period beginning with the alleged taking; i. e., when the producing wells were completed in the adjoining lands, and ending March 3, 1957.

It seems clear that the courts will not leave the royalty owners completely at the mercy of the holder of the exclusive leasing power; however, the Texas law is not clear as to what rights the owner of a royalty interest has in these circumstances. In Moore v. City of Beaumont, 195 S.W.2d 968, at page 980 affirmed 146 Tex. 46, 202 S.W.2d 448, the Court of Civil Appeals said:

> " * * * A royalty owner has no power to lease or use the surface, or to interfere with the land owner in any way. It might be, or it might not be true that the courts would raise an implied obligation in his favor, requiring the land owner to lease the land under certain circumstances; * * * ."

In the same case, on motion for rehearing, the court said in 195 S.W.2d at page 995:

> " * * * Perhaps, as we have said in our original opinion, there

3. 61 Stat. 913 designates the Secretary of Interior as the leasing authority, 30 U.S.C.A. § 351 et seq.

will be circumstances when a court, at the prayer of a royalty owner, will compel the owner of the lease right to make a lease; but if these circumstances ever arise, the court will act under some principle of equity jurisprudence and not under some rule of land law."

We believe as between the mineral fee owner and the royalty owner there is an implied covenant in the deed that the mineral fee owner will use the utmost fair dealing and diligence in obtaining lease agreements in order to protect the royalty owner's interest.

What then would be "utmost fair dealing and diligence" in the circumstances of this case? We are of the opinion that the court should require the same degree of diligence and discretion on the part of the mineral fee holder as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to cooperate with a prospective lessee. See 26 Tex.L. Rev. 569.

■ The implied covenant of utmost fair dealing and diligence in the case of a royalty interest for a term of years would require this court to impose a somewhat more stringent rule than in the case of an agreement not limited by time. This is necessarily so because the mineral fee owner cannot be permitted to reduce the value of the royalty interest by inaction which would eventually inure to its benefit. A more stringent rule, we believe, would only require the mineral fee owner to act with more celerity. It should be said in this connection, however, that the Government as a body politic cannot lend itself to the same speedy action as an individual or a corporation. It must work within the framework of the laws and regulations as are designed to protect the public from executive waste in dealing with the public domain. This does not mean that the Government could stand idly by and permit the oil in place to be depleted. The Government must act as speedily as possible under the circumstances.

There is an obligation on the part of the Government to lease for drilling if the facts show that wells on the adjacent land are producing oil and possibly depleting the oil in place and recoverable from the land in question. This obligation arises as we have said because the Government owes a duty to act with reasonable diligence and discretion.

■ The facts in this case show that the Government violated the above rule. Some time between August and December 1955 the Government learned that oil had been discovered on adjacent land in paying quantities which could result in the drainage of the oil and gas from the land in question. In December 1955 action was taken to transfer jurisdiction to the Department of Interior in order to exploit the minerals in the lands within the Air Force base. On or about May 4, 1956, the transfer was completed and on July 18, 1956, the land was offered for leasing. Up to this time, in our opinion, the Government had acted fairly and with diligence. However, on August 29 the offer to lease was withdrawn for administrative reasons.

The administrative reason for withdrawing the July 18 offer by the Government was to allow the Government to include in the proposed leasing, lands not belonging to the plaintiff, and could only have affected the interest of the Government, or perhaps some third party. It is not suggested, and we cannot conceive of any benefit to plaintiff as a result thereof. In fact, the action resulted in a 2-months' delay in the leasing and drilling operations thereunder; i. e., from August 29, the date the bids were to be opened, to October 31, the date the bids actually were opened. This caused the producing well to be brought in after the expiration of plaintiff's royalty interest. We believe this to be in violation of the "fair dealing and diligence" rule above set forth and resulted in a breach of a contractual duty which was owed to plaintiff; i. e., to lease and drill without unnecessary delay, where it is known, or there is a reasonable likelihood, that oil

is being drained by drilling operations on adjacent land.

The Government received the benefit by receiving royalties during a period which otherwise would have inured to the benefit of the plaintiff. We think these circumstances entitle the plaintiff to recover for that loss of its royalty interest because the Government breached the implied contractual obligation which it owed plaintiff to act with "diligence and discretion." [4]

The question as to the amount of damages is reserved for future determination. However, we believe rather than measured by the oil taken from adjacent land, the loss of royalty interest should be measured by the amount of oil actually taken from the land in question.

Plaintiff's motion for summary judgment is granted, and defendant's motion is denied. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to rule 38(c) of the Rules of this court.

It is so ordered.

JONES, Chief Judge, and MADDEN, Judge, concur.

WHITAKER, Judge (dissenting).

I do not agree with the court's opinion.

On page 4 of the slip opinion it is said: "We believe as between the mineral fee owner and the royalty owner there is an implied covenant in the deed that the mineral fee owner *will use the utmost fair dealing and diligence* in obtaining lease agreements in order to protect the royalty owner's interest." [Italics supplied.]

This seems to me to impose on the fee owner an obligation tantamount to that of a fiduciary. I do not think the fee owner is under any such obligation. In determining whether or not to seek to lease or to develop the mineral interests in his land, the fee owner may consult his own interest as well as the interest of the royalty owner. He is under no obligation to protect the interest of the royalty owner to his own disadvantage. On the other hand, he is not privileged to impair the interest of the royalty owner to augment his own interest. But there is no evidence whatever that the action of the Government was dictated by a desire to enhance its own interest at the expense of the royalty owner.

The majority opinion concedes that the Government acted with diligence up until July 18, 1956, at which time the land was offered for leasing. But the majority opinion says that the withdrawal of the offer to lease on August 18 was prejudicial to the interests of the royalty owner, and resulted in a two months' delay, for which the Government is liable.

With this I do not agree. The Government thought it was to its own interest to withdraw the offer to lease in order to include in the lease other property in which the royalty owner had no interest. This, it seems to me, it had a right to do. It did not have to prefer the royalty owner's interest over its own interest. Believing it was to its own interest to effect a lease on additional lands, it seems to me it had a right to withdraw its offer to lease only the lands in which plaintiff had a royalty interest.

It is true the incidental effect of this was to deprive plaintiff of certain income, but there is no showing that this was the motive dictating the Government's action. The loss to plaintiff, it seems to me, was the incidental result of the exercise of a lawful right on the part of the fee owner to secure the most advantageous lease of his lands. For this I do not think the fee owner is liable. It would be otherwise, of course, if the fee owner had acted for the purpose of defeating the royalty owner's interest, but this is not the case. There is no evidence of bad faith on the part of the fee owner.

I would dismiss plaintiff's petition.

---

4. Although the plaintiff alleges a compensable taking under the Fifth Amendment, we believe sufficient facts are alleged to give rise to a contractual relationship.