**J.M. HUBER CORPORATION,**
Plaintiff-Appellee,

v.

**SQUARE ENTERPRISES, INC.,**
Defendant-Appellant.

Court of Appeals of Tennessee,
Middle Section,
at Nashville.

Oct. 26, 1982.

Rehearing Denied Nov. 22, 1982.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 17, 1983.

Paul D. Kelly, Jr., Kelly, Leiderman, Cameron, Kelly & Graham, P.C., Jasper, for plaintiff-appellee.

Richard P. Jahn, Sr., Tanner, Jahn, Atchley, Bridges & Jahn, Chattanooga, for defendant-appellant.

## OPINION

LEWIS, Judge.

Suit was filed in the Chancery Court for Franklin County seeking a declaratory judgment that a certain reservation in a deed was void ab initio in that it violated the rule against perpetuities or, in the alternative, for construction of the reservation.

The Chancellor, after a bench trial, found, *inter alia,* that the "reservation did not violate the 'rule against perpetuities' and is, therefore, not void" and that the reservation created a "non-participating royalty interest."

The pertinent facts are as follows:

R.D. Campbell and wife Myra G. Campbell owned an 11,900 acre tract of mountain land in Franklin and Marion Counties, Tennessee. In February, 1958, they conveyed this land by deed to Clear Water Lake Groves, Inc. The deed contained the following reservation:

> In making this conveyance, it is expressly agreed and understood that R.D. Campbell and wife, Myra G. Campbell, their heirs and assigns, hereby expressly reserve a one-half (½) interest in all royalties received from minerals of every kind and nature whatsoever mined on or removed from the property hereinabove described, which rental or royalties shall be paid directly to the grantors, their heirs and assigns, by the purchaser thereof.

> It is agreed between the parties hereto that the reservation here made is as to royalties and not a reservation of an estate in fee.

The foregoing is hereafter referred to as the "Campbell reservation."

Subsequently, Clear Water conveyed to George M.D. Lewis, Jr., who was the original plaintiff. While the case was pending, J.M. Huber Corporation was substituted as party plaintiff after Lewis conveyed the land to Huber. The royalty interest (Campbell reservation) was subsequently conveyed by the Campbells to defendant Square Enterprises, Inc.

No issue was raised by the parties regarding the Chancellor's holding that the "Campbell reservation" created a non-participating royalty interest; however, the question did arise at oral argument. After a review of the record and the law regarding non-participating royalty interests, we are satisfied that the Chancellor reached the correct result.

The different interests that can be created in minerals begin with the fee simple estate or absolute ownership. The owner of the fee absolute has the same rights and privileges with regard to the minerals as are enjoyed relative to the surface. A total or partial mineral estate may be granted separately from the surface. *Layne v. Baggenstoss,* 640 S.W.2d 1 (Tenn. App.1982). Severance of the mineral interest from the surface interest creates a mineral estate. H. Williams, R. Maxwell and C. Meyers, *Oil and Gas,* 540–545 (1979).

The rights that accompany the mineral estate are several. The owner of the mineral estate can sell all or any part of the mineral interest. There are also the rights to explore for minerals and to exploit minerals when found. Because exploitation is expensive, risky, and requires special knowledge, owners typically lease the mineral estate for development by commercial operators. These operators, who have a leasehold of the mineral estate, take the extracted minerals. The owner of the mineral estate, the lessor, receives a rent on the mineral estate called "royalty." *Id.*

A "royalty" was originally a tax payable in England to the sovereign for the privilege of operating royal mines. 3 *American Law of Mining* § 17.1 (Rocky Mountain Mineral Law Foundation, 1981).

Today "royalty" has many different meanings. 58 C.J.S. *Mines and Minerals* § 213 (1948). The right to receive a "rent" from the leasing of land for mineral exploitation is one aspect of the meaning of "royalty."

The right to receive rent from leasing can be granted or reserved separately from the mineral estate prior to the letting of a lease. *Watkins v. Slaughter,* 144 Tex. 179, 189 S.W.2d 699 (1945). A right so granted or reserved is called a "non-participating royalty" (NPR). In this context the term "royalty" simply means rent. 54 Am.Jur.2d *Mines and Minerals* § 135 (1971). The term "non-participating" indicates that the owner of the NPR does not participate in the other incidents of mineral estate ownership. 3A Summers, *Oil and Gas* § 599 (1958). The owner of the NPR has no right to execute a lease for exploitation, no personal right to develop or to explore and, if a lease exists, no right to share in the payment of delay rental or bonus money paid to the owner of the fee. *Id.*

The rights enumerated can be granted or reserved along with the right to receive royalty. While a right to share in delay rental and bonus money often are specifically included in a transfer of the right to receive royalty, the executive rights are generally lodged in the owner of the mineral fee. Executive rights include the powers to lease, to explore and to develop personally. Since the NPR owner does not have a voice in that regard, the NPR is sometimes called a "non-executive royalty." Williams, Maxwell and Meyers, *supra.*

In the instant case the owner of the "Campbell reservation" held an NPR and no part of the fee. The language of the "Campbell reservation" is plain, the owner holds "a one-half (½) interest in all royalties received from minerals ... mined on or removed from the property." The only right reserved is the right to receive royalty from the exploitation of the mineral estate.

The right of the owner of the "Campbell reservation" to receive royalty applies only to minerals "mined on or removed from"

the land. It has been held that these words are dispositive of the issue because a mineral estate is constituted of minerals "in and under" the ground. *Stokes v. Tutvet,* 134 Mont. 250, 328 P.2d 1096 (1958). Some other jurisdictions have relied on the presence of the word "royalty" as foreclosing any grant of the underlying estate. *Id., e.g.,* R. Maxwell, *The Mineral Royalty Distinction and the Expense of Production,* 33 Tex.L. Rev. 463 (1954).

The Chancellor correctly concluded that defendant Square Enterprises (owner of the "Campbell reservation") held a non-participating royalty interest only.

Plaintiff-appellee, in the Chancery Court and on appeal, contends that the "Campbell reservation" violates the rule against perpetuities and is therefore void.

At least two states have held that it is not possible to create a royalty interest apart from the mineral estate except as to royalty under an existing lease. *Bellport v. Harrison,* 123 Kan. 310, 255 P. 52 (1927); *Pease v. Dolezal,* 206 Okl. 696, 246 P.2d 757 (1957). These states regard the right to receive royalty as personalty. In both Kansas and Oklahoma the rule against perpetuities will strike down the grant of an NPR where there is no extant lease at the time of the creation of the NPR. *Miller v. Sooy,* 120 Kan. 81, 242 P. 140 (1926). The Kansas Supreme Court has said: "There is no limitation on the time within which a future lease would be required to be executed. It is, therefore, wholly problematical when, if ever, such an interest would vest. Such a grant violates the rule against perpetuities, a rule against too remote vesting." *Lanthrop v. Eyestone,* 170 Kan. 419, 227 P.2d 136, 144 (1951).

■ However, in Tennessee the right to receive "royalty" is classified as realty. *Mullins v. Evans,* 43 Tenn.App. 330, 308 S.W.2d 494 (1957). The rule is that the conveyance of the rent, profits or income from land is equivalent to a conveyance of the land itself. *Mays v. Beech,* 114 Tenn. 544, 86 S.W. 713 (1920); *Johnson v. Johnson,* 92 Tenn. 559, 23 S.W. 114 (1893); *Davis v. Williams,* 85 Tenn. 646, 4 S.W. 8 (1887).

While our research fails to disclose any Tennessee decisions determining whether the right to receive royalty is corporeal or incorporeal, several jurisdictions have held that royalty interests are corporeal constituting an ownership interest in the underlying mineral estate itself. *Stephens County v. Mid-Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290 (1923); *Toothman v. Courtney,* 62 W.Va. 167, 58 S.E. 915 (1907); *Corlett v. Cox,* 138 Colo. 325, 333 P.2d 619 (1958).

■ The better rule is that the right to receive royalty is corporeal and constitutes an interest in the underlying mineral estate. It is, therefore, possible to sever that right and vest it immediately in another. *Schlittler v. Smith,* 128 Tex. 628, 101 S.W.2d 543 (Tex.Com.App. Sec. A 1937).

■ We therefore hold that the right to receive royalty under the Campbell reservation vested immediately in the grantor and, therefore, does not violate the rule against perpetuities. Appellee's issue is without merit.

Defendant Square Enterprises has presented three issues. It states its issues I and II as follows:

I. Is the holder of a 50% non-participating royalty interest entitled to one-half of the fair market value of any and all minerals extracted from the premises, free of the expenses of exploration and production, whether extracted by third parties or the owner of the fee?

II. Is the holder of the fee a fiduciary to the holder of a 50% non-participating royalty interest, with a duty of full disclosure; a duty to account; a duty to permit reasonable inspection of the premises and pertinent records and a duty to use the utmost fair dealing and diligence in leasing or otherwise dealing with the minerals involved so as to protect the interests of the holder of the reservation and permit a reasonable return to such holder?

We restate these issues so as to deal with the matters fairly presented to the Chancellor and this Court, as follows:

1. What is the quantum of the non-participating royalty interest?

2. Does the owner of the executive power owe a duty to the owner of the NPR and, if so, what is the standard defining that duty?

3. Does the standard require the executive owner to explore and develop?

We first discuss the quantum of the royalty in the Campbell reservation. The Chancellor in the final decree states as follows:

2. The Defendant, Square Enterprises, Inc., by virtue of its ownership of the said reservation, owns a non-participating royalty interest and does not own any interest in the fee of the subject real estate.

3. The said Defendant has no right to lease, mine or exercise any type of dominion over the subject minerals, and its right is limited to the entitlement to receive fifty (50%) percent of any production royalties produced from the minerals located upon the subject real estate (for example, if the J.M. Huber Corporation were to enter into an oil and gas lease, and the standard production royalty of one-eighth (⅛) were obtained, the Defendant would be entitled to a royalty of one-sixteenth (¹⁄₁₆) of the production, and Huber would be entitled to the same royalty. If a coal lease were to provide for royalty of Two and No/100 ($2.00) Dollars per ton, Huber and Square would each receive One and No/100 ($1.00) Dollar.), and/or a reasonable royalty from any minerals that may be produced by the J.M. Huber Corporation, its successors and assigns.

■ Defendant contends that it is entitled to one-half of the fair market value of all extracted minerals cost free. In support of this contention, it relies on *Arnold v. Ashbel Smith Land Company*, 307 S.W.2d 818 (Tex.Civ.App. Houston 1957), writ ref'd). Defendant's reliance is misplaced. In *Arnold* the grantor received a royalty of "one-fourth part of such oil, gas and other minerals." *Id.* at 820. This language is clear. The grantor intended to and did reserve "one-fourth" of all minerals as royalty. Not so in the instant case. The "Campbell reservation" reserved "a one-half (½) interest in all royalties received from minerals;" hence, one-half of the minerals was not reserved, but one-half of the royalty/rent received was reserved.

The Chancellor's holding as to the quantum of the royalty is affirmed.

We next discuss the issue of whether the owner of the executive power owes a duty to the owner of the NPR and, if so, what is the standard defining that duty.

All jurisdictions, except perhaps Louisiana, confronted with the issue of whether a general duty exists have held that some duty does exist between the executive owner and the owner of the NPR. 1 Kuntz, *Law of Oil and Gas* § 15.7, note 21 (1962). While it is somewhat analogous, the executive's duty should not be confused with the duty existing between mineral lessors and lessees. *See*, 2 Williams and Meyers, *Oil and Gas Law* §§ 338–339.3 (1981); 1 Williams and Meyers, *supra* § 205.1 (1981).

Most jurisdictions rest the duty on an implied covenant between the grantor and the grantee of the NPR interest. *Federal Land Bank of Houston v. United States*, 168 F.Supp. 788, 144 Ct.Cl. 173 (1958); *Hanson v. Ware*, 224 Ark. 430, 274 S.W.2d 359 (1955); *Lamp v. Locke*, 89 W.Va. 138, 108 S.E. 889 (1921); *Schlittler, supra.*

Insofar as we are able to determine, the duty, if any, which exists between the executive owner and the owner of the NPR interest has not been addressed in Tennessee.

The leading case defining the duty owed between the executive owner and the owner of the NPR is *Federal Land Bank of Houston v. United States*, 168 F.Supp. 788, 144 Ct.Cl. 173 (1958), wherein the Court stated as follows:

It seems clear that the courts will not leave the royalty owners completely at the mercy of the holder of the exclusive leasing power; . . . .

We believe as between the mineral fee owner and the royalty owner there is an

implied covenant in the deed that the mineral fee owner will use the utmost fair dealing and diligence in obtaining lease agreements in order to protect the royalty owner's interest.

What then would be "utmost fair dealing and diligence" in the circumstances of this case? We are of the opinion that the court should require the same degree of diligence and discretion on the part of the mineral fee holder as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to cooperate with a prospective lessee.

*Id.* 168 F.Supp. at 790–791.

Williams and Meyers have expounded on the *Federal Land Bank* definition as follows:

The standard, it seems to us, comes down to an ordinary prudent land owner test. The executive is required to exercise his exclusive leasing power in the same manner as an ordinary, prudent land owner would exercise the leasing power inherent in the mineral fee. The executive's conduct will be judged by such standard, as if no royalty or non-executive mineral interest were outstanding. Where the interests of the executive and the non-executive coincide, the failure to exercise the executive right or the improper exercise thereof due to carelessness, inattention, indifference or bad faith will result in liability. Where the interest of the executive and non-executive diverge, the executive will not be bound to a standard of selfless conduct, such as that imposed on trustees or guardians. He may exercise the executive right with the same self-interest in mind as if there were no outstanding royalty or non-executive mineral interest. But the executive cannot exercise (or refuse to exercise) the executive right for the purpose of extinguishing the non-executive interest, or for the purpose of benefiting himself at the expense of the non-executive. If the conduct of the executive satisfies the ordinary, prudent land owner standard, the fact that the non-executive owner has been harmed is not actionable under this view. But if an ordinary, prudent land owner, not burdened by an outstanding non-executive interest, would have acted differently, then the executive's conduct is actionable if it causes harm. We believe this standard fairly effectuates the intent of the parties; it does not require more than can be expected of ordinary land owners and does not permit less, especially where the "less" is due to the executive's effort to profit at the expense of the royalty or non-executive mineral owner.

2 Williams and Meyers, *supra,* § 339.2.

█ In the absence of any prior decisions, we adopt the rule that there is a general or overall duty to which the executive or mineral fee owner must conform in relation to the owner of the NPR interest. We are of the opinion that the "ordinary prudent land owner" test as enunciated by Williams and Meyers is the standard to which the executive or mineral fee owner must conform.

Our review of the record in the instant case fails to disclose evidence from which either the Chancellor or this Court could determine the issue of whether plaintiff owed a duty to explore and develop.

The issue not being fairly raised, we affirm the Chancellor in his refusal to address the issue.

By its last issue, defendant contends the Chancellor erred in failing to award it costs under T.R.C.P. 41.04, which is as follows:

If a plaintiff who has once dismissed an action in any court commences an action based upon or including the same claim against the same defendant, the court may make such order for the payment of costs of the action previously dismissed as it may deem proper and may stay the proceedings in the new action until the plaintiff has complied with the order.

Plaintiff, prior to filing the instant suit, had sought a declaratory judgment in the United States District Court at Chattanooga. Plaintiff voluntarily dismissed the District Court suit and filed this action seeking the same relief.

■ While it would have been within the sound discretion of the Chancellor to have required plaintiff to pay the costs incurred by defendant in the prior suit before proceeding with the instant suit, the record does not disclose that this relief was sought at that time. Further, it would have been within the sound discretion of the Chancellor to have awarded costs at the conclusion of the suit.

■ It is elementary that taxation of costs in equity cases is largely in the Chancellor's discretion and will not be disturbed except for manifest and palpable abuse. *Branstetter v. Poynter,* 32 Tenn.App. 189, 222 S.W.2d 214 (1949).

■ We have reviewed the record before us and it fails to disclose that the Chancellor abused his discretion.

The judgment of the Chancellor is affirmed with costs to defendant Square Enterprises and the cause remanded to the Chancery Court for the collection of costs and any further necessary proceedings.

TODD, P.J. (M.S.), and CANTRELL, J., concur.

## OPINION ON PETITION TO REHEAR

LEWIS, Judge.

Defendant has filed a petition to rehear suggesting that the opinion of this Court failed to consider two aspects of a nonparticipating royalty (NPR) as urged by the defendant: (1) that an NPR is a cost-free royalty and, as such, is properly payable only by a cost-free fractional share of production or the fair market value equivalent thereof; and not by a strict money royalty based on a dollar per unit of production calculation; and (2) that the language of the Campbell reservation, as well as the incidence of an NPR, grants a one-half interest in the total production of the minerals rather than the royalties paid for the extraction of the minerals.

For its first point, defendant relies on the definition of NPR in 54 Am.Jur. *Mines and Minerals* § 135:

A "nonparticipating royalty" is an interest in minerals which is nonpossessory, which means that it does not entitle the owner to produce minerals himself, or permit him to join in leases of the mineral estate, but merely entitles him to a certain share of the production under the lease, free of expense of exploration and production.

Defendant has cited two cases in support of this definition. *Picard v. Richards,* 366 P.2d 119 (Wyo.1960); *Mounger v. Pittman,* 235 Miss. 85, 108 So.2d 565 (1959).

Nevertheless, we decline to follow this aspect of the precedent from other jurisdictions because it is our opinion that it has no application either to the instant case or to the law of Tennessee generally. The Campbell reservation retains "a one-half (½) interest in *royalties received from minerals of every kind and nature whatsoever* mined on or removed from the property . . . ." (Emphasis ours.) The quantum and the mode of payment must be determined first by the instrument creating the NPR. Defendant's "nonparticipating royalty" is therefore defined in terms of whatever "royalty" is paid and however it is paid for the extraction of minerals.

■ Furthermore, the fraction of production method of payment cannot be universally mandated in the NPR context because the word "mineral" encompasses not only oil and gas but also hard minerals. *Murray v. Allred,* 100 Tenn. 100, 43 S.W. 355 (1897). While cost-free fractions may be the accepted method of payment for oil and gas royalties, that custom has no place in hard-mineral mining. 3 *American Law of Mining* § 17.3 (Rocky Mountain Mineral Law Foundation 1981). Finally, although the NPR constitutes an interest in the underlying mineral estate, the executive owner controls the disposition of that interest pursuant to the fiduciary duty outlined in the opinion of this Court.

In its second point, defendant urges that the word "royalty" in the Campbell reservation be defined as "the right to share in production on severance" or as a "fractional interest in production of minerals" which

definitions are among several found in 2 *Thompson on Real Estate* § 179 (1980).

We are of the opinion that neither the facts nor the law support this contention. The language of the Campbell reservation does not reflect such intent. Furthermore, defendant's argument in this regard has heretofore been considered by the Court and rejected. Defendant takes one-half of whatever royalty is paid however it is paid for the extraction of minerals from the property by the executive owner or another.

The petition to rehear is denied at the cost of defendant.

TODD, P.J. (M.S.), and CANTRELL, J., concur.