JESSIE SCHROEDER, Plaintiff-Appellee, v. FREDERICK A. SCHROEDER et al., Defendants-Appellants.
Fifth District   No. 5—84—0367

Opinion filed May 8, 1985.

John E. Rhine, of Fowler, Rhine & Cawley, of Mt. Carmel, for appellant Frederick A. Schroeder.

John F. Borden, of Gosnell, Benecki, Borden & Enloe, Ltd., of Lawrenceville, for appellee.

PRESIDING JUSTICE JONES delivered the opinion of the court:
This is a case of first impression in Illinois, presenting the issue of whether the holder of an executive right to a mineral interest has a

duty to the owner of a mineral interest subject to that executive right, and, if so, what is the nature and extent of that duty.

The plaintiff, Jessie Schroeder, and the defendant, Frederick Schroeder, were married in 1935 and divorced in 1972. As husband and wife and as tenants in common they had owned, among other real property, the 54 acres involved here. Pursuant to the court-ordered disposition of the parties' property at the time of the divorce, in 1972 the plaintiff, who is a schoolteacher, quitclaimed her interest in the 54 acres to the defendant Schroeder, who is a farmer, reserving her right, title, and interest in the oil, gas and other minerals. She granted to the defendant Schroeder, until his death or until the sale of the property, the exclusive right to lease the reserved mineral interest for the purpose of producing oil, gas, coal and other minerals. On July 29, 1980, the defendant Schroeder executed an oil and gas lease individually and on behalf of the plaintiff, as lessors, with Snyder Drilling and Well Service as lessee.

On December 23, 1982, plaintiff brought suit against the defendant Schroeder as well as Snyder Drilling and Well Service and Farm Bureau Oil Company, Inc. In the complaint she alleged that the defendant Schroeder had executed a lease on behalf of himself and plaintiff to Snyder Drilling and Well Service, which lease provided for a one-eighth royalty to the lessors. The plaintiff alleged further:

"5. At the time defendant, Frederick Schroeder, executed such on plaintiff's behalf, defendant had a fiduciary obligation of utmost fair dealing in leasing her interest.

6. Notwithstanding such obligation and duty, defendant illegally negotiated the lease transaction unfairly to plaintiff and for his own advantage as follows: as consideration for execution of such lease providing for the one-eighth royalty (which will be divided equally between the parties plaintiff and defendant) he took for himself alone an overriding royalty interest in such lease of one-sixteenth of seven-eighths of the gross production and upon such information and belief plaintiff states defendant took certain other bonuses and benefits which he has failed and refused to account for to plaintiff."

The complaint alleged further that the defendant Snyder Drilling and Well Service had drilled one or more producing wells on the property or on premises with which the property is communitized and was selling oil to the defendant Farm Bureau Oil Company, Inc., a pipeline purchaser, which had issued payments to the defendant Schroeder pursuant to the assignment of overriding royalty interest. The plaintiff sought to have the defendant Schroeder ordered to execute an as-

signment of one-half of the overriding royalty received by him; damages in the amount of $10,000 for monies received by the defendant Schroeder "as payment upon such overriding royalty, bonuses, and rentals"; an order canceling the defendant Schroeder's executive right to lease the plaintiff's oil, gas, and mineral interests without her permission; and reasonable costs. The plaintiff sought to have the defendant Farm Bureau Oil Company ordered to impound all funds representing the defendant Schroeder's overriding royalty from the sale of oil and gas produced pursuant to the lease and the defendant Snyder Drilling and Well Service required to account for all oil and gas representing the overriding royalty interest assigned to the defendant Schroeder.

In paragraph six of the defendant Schroeder's answer he stated:

> "As to Paragraph 6 of Count 1 of the Complaint, he admits that, as consideration for execution of such lease providing for the 1/8th royalty, he took for himself alone an overriding royalty interest in such lease of 1/16th of 7/8ths of the gross production, but denies that he took any other bonuses or benefits, and denies that the lease transaction was negotiated by him illegally or unfairly to Plaintiff, and denies the existence of any 'obligation and duty' such as is referred to in said Paragraph 6."

In an interrogatory directed to the defendant Schroeder the plaintiff asked him to "[d]escribe what agreements, if any, you have made with Snyder Drilling and Well Service and/or Farm Bureau Oil Company, Inc. concerning your receiving an overriding royalty by reason of your execution of a lease covering the lands described in plaintiff's complaint." To this the defendant Schroeder responded: "A copy of the memorialization of the only such agreement is attached hereto, said memorialization being dated July 29, 1980."

At a bench trial the plaintiff testified in her own behalf that around Easter of 1980 she had learned from her son, Brian Schroeder, an adult, that he had arranged for oil leases on his land and on the 54 acres in question, which adjoins his land, and that "he had gotten an override for himself, for his father and for me." The plaintiff said that she had looked into the matter around Easter in 1982 "[s]ince the well had come in in '81 and it's now '82 and we had received no checks." She had, she said, sought to obtain the defendant Schroeder's signature upon an assignment, admitted into evidence as plaintiff's exhibit No. 7, which, had it been executed, would have provided for "an undivided 1/32 X 7/8 overriding royalty interest" each to the plaintiff and the defendant Schroeder as assignees in and to the oil and gas lease of July 29, 1980. The plaintiff testified that the

defendant Schroeder had told her, when she had asked him to sign this assignment, that "he already had an assignment of oil and gas lease and there wasn't a damn thing I could do about it" and that with those "exact words" he had ended the conversation. She stated that prior to the divorce she and the defendant Schroeder had leased land for oil and gas development and that they had received "[t]he one-eighth owners' royalty, plus an override." It was "very common to get an override," she said, and the instrument providing for the override "would either be typed into the lease or it would be typed onto an addition and taped to the lease."

Testifying on behalf of the plaintiff, Brian Schroeder stated that he farms with his father, the defendant Schroeder, and is also "in the oil business." He said that he "operate[s] as well as lease[s] for various parties as a lease man, operator," and that he also "pump[s] wells." Prior to 1980 he made an investigation concerning the feasibility of oil and gas production from the 54 acres in question and his own 40 acres to the west in order "[t]o try to get an oil company to go back in and redrill the property." He had, he said, incurred expenses "accumulat[ing] maps and isopachs and well logs from previously drilled producing wells" and in 1980 had contacted Harold Snyder "[t]o see if they would look at the property and see if it was feasible to drill it. They thought it would be feasible and we started to negotiate deals then for the properties involved." The witness leased to Snyder Drilling and Well Service and received, he said, "a thirty-second override for leasing my property. I also encouraged Snyder to look at my father's property and I was in hopes that I might get an override for negotiating that lease." The amount of override the witness receives was, however, stated elsewhere in the record to be one-sixteenth. In further testimony the witness said, "On my father's property, I was hoping that by putting the deal together and going to Snyder's with it that they might offer me an override on the property. It's quite normal for the landman or the fellow who puts the package together to get an overriding royalty." He had, he said, spoken to Harold Snyder "several times" in the spring of 1980 about leasing the 54 acres and had negotiated with Harold Snyder concerning the terms of the lease. He described Harold Snyder as "agreeable to" a "one-eighth standard royalty and a one-sixteenth overriding royalty on both parties." By "both parties" the witness stated that he was referring to himself and his parents. After having negotiated with Harold Snyder, the witness apprised his father of the negotiations. He testified that the defendant Schroeder "was aware that there would be an override on the property" and that his father had "agreed to" the

amount of the override, but that when he discussed with his father the possibility of the witness' receiving half of the override, his father stated he "was going to handle the override himself. So I then backed out of the negotiations." The witness likewise told his mother of the terms he had negotiated. The majority of other leases of landowners in the area provide, he said, for "a sixteenth overriding royalty, plus their one-eighth royalty. That carries through from the old agreement with the Skiles Oil Company." The instrument by which the landowner usually gets the overriding royalty, according to the witness, "would either be on the bottom of the original form itself or it would be an Exhibit 'A' attached to the lease." On cross-examination he stated that he had had no written authority to negotiate leases for the defendant Schroeder.

Testifying as an expert on behalf of the defendant, Gale Miller stated that he is a "professional landman" and the president of Cedar Resources, Inc., "a brokerage firm, independent landman and oil producing company." A typical royalty interest received by landowners in the Illinois basin is, he said, "an eighth, unless there is a severance, at which time there can be negotiations that would include other interests." Asked whether it is common practice in the Illinois basin to give the surface owner an overriding royalty interest, the witness responded, "It's not uncommon, especially in areas where there are severances, where the surface owner does not own a hundred percent of the minerals." Asked to provide the rationale for this practice, he stated, "The rationale on the part of the lessor, being the surface owner, is that he's going to be subjected to damage, subject to interruptions that the mineral owner is not, and the feeling is getting stronger and stronger that they need some compensation for that." It is, he said, "not unusual any more" in the Illinois basin to give the "landowner" a one-sixteenth of seven-eighths overriding royalty interest. Asked whether he has "ever" been instructed by his clients to offer greater compensation to those who own the surface in addition to the mineral estate, as opposed to a mineral estate only, he responded affirmatively, stating the rationale to be that "it's a free country and the seller has the right to make his own decision. If he has more to sell than another person, he's entitled to more." The witness stated that sometimes "specific cash payments" are made to landowners rather than overrides and that "sometimes they won't execute the lease without [an override]. That's the consideration for the use of their surface." Asked on redirect whether it would be common for surface landowners to take a one-sixteenth of seven-eighths override in consideration for the burdens upon the surface the witness an-

swered, "As compensation, yes, of course." He testified further that the overriding royalty interest is more commonly created in the lease rather than in a separate instrument.

Testifying in his own behalf, the defendant Schroeder stated that he had received a one-sixteenth of seven-eighths overriding royalty interest and that he did not in any way intend to hide this from the plaintiff. He testified that, in order to place tank batteries, topsoil had to be taken from his field to build up the surface over an area that he estimated as being 80 feet long, 60 feet wide, and 8 feet tall. He estimated further that 1,000 yards of topsoil had been moved for this purpose. Other areas had also to be built up to provide two levees, a slough, and a place for the pump jack. Soil was taken from "at least five" acres, with the topsoil being taken to a depth of "probably eight inches." For this damage, he said, Snyder Drilling and Well Service had paid him nothing.

On cross-examination he testified that neither he nor his son Brian had measured the mound of earth created by the tank batteries. He had, he said, "usually" received an overriding royalty any time he had leased. The exhibits indicate that he had leased for oil and gas five times prior to executing the lease of July 29, 1980. On two of the earlier leases admitted into evidence an override was provided for on the face of the lease. There appears to be an override associated with four of the prior leases. In each of the four instances a one thirty-second of seven-eighths overriding royalty interest is specified.

The witness stated that he had received a letter dated July 29, 1980, from Harold Snyder concerning the override in dispute here. The letter, admitted into evidence as plaintiff's exhibit No. 5, provides:

> "This is to memorialize our verbal agreement with regard to the execution and delivery by you of a Oil and Gas Lease to Snyder Drilling and Well Service covering the following real estate:
>
> [Property description of the 54 acres in question] That I hereby agree that, upon demand, I will assign or cause to be assigned to you an undivided 1/16 X 7/8 Overriding Royalty Interest in and to the Oil and Gas Lease covering the above described real estate which you have executed and which bears date of July 29, 1980."

The assignment, which appears in the record as plaintiff's exhibit No. 6, was executed on July 8, 1982. The defendant Schroeder denied that he had attempted to deceive the plaintiff by using the letter rather than putting the material concerning the override in the lease. In the

following colloquy the credibility of the defendant Schroeder was impeached by his prior statement in a deposition taken about two weeks prior to the trial:

"Q. \*\*\* Do you remember this question:

'Question: Did you think about having him just type that (discussion of the override) in the lease that you were reserving to yourself an override?

Answer: Well, if it did it would have went in the lease, and I didn't want it on the oil lease.

Question: Why not?

Answer: Because she would have probably claimed half of it if it went on the oil lease. I didn't want it on that.'

Do you remember that question and answer?

A. That's right."

On redirect examination the defendant Schroeder testified that the override was "[f]or land damage."

The trial court entered judgment in favor of the plaintiff, making detailed findings of fact. Among its findings and conclusions, the trial court included the following:

"He [defendant] allowed his own interests to predominate, and Plaintiff's to suffer accordingly. He took for himself that which Brian had already secured for both Plaintiff and Defendant, and which Snyder was willing to grant merely for execution of the lease, even though he could have negotiated, or tried to negotiate, something further for land damages. There is no evidence that he made any such attempt.

\* \* \*

Since Defendant executed the lease for Plaintiff as well as for himself, he was, and is, obligated to share the payment with her."

The defendant Schroeder was ordered to execute, acknowledge, and deliver to plaintiff an assignment of an undivided one-half interest in and to the one-sixteenth of seven-eighths overriding royalty interest assigned to the defendant Schroeder by the defendant Snyder Drilling and Well Service as described above. The defendant Schroeder was ordered to pay to plaintiff the sum of $5,056.53, which is one-half of the net proceeds of the overriding royalty already received by him, $455.97 in interest on the amount of the overriding royalty wrongly received by him, and $366.38, which constitutes one-half of the windfall profits tax withheld. The trial court further ordered the executive right granted to the defendant cancelled, annulled, rescinded, and held to be void and of no further force or effect.

The other defendants, who bore positions essentially as stakeholders, were directed to adjust their records and payments to conform the interests of the Schroeders to the court's determination of their interests. Of the three defendants only the defendant Schroeder has taken an appeal from the judgment. Hereafter any reference to the "defendant" is to the defendant Schroeder.

■ We agree with the plaintiff that the defendant misstates the issue presented here, which he sets forth as follows: "The issue is whether a surface owner, having the executive right to lease for exploration of oil and gas, may demand and receive overriding royalties paid for use of the surface and damages thereto caused by the development of the property for oil, gas and mineral production."

The "executive right" is defined as "the exclusive power to execute oil and gas leases" and is created by the grant or reservation of a non-participating royalty or a non-executive mineral interest in oil and gas. (2 H. Williams & C. Meyers, Oil & Gas Law sec. 338, at 192-93 (1983) (hereafter cited as Williams & Meyers).) An "overriding royalty" is defined as "a fractional interest in the gross production of oil and gas, in addition to the usual royalties paid to the lessor." (3 W. Summers, The Law of Oil & Gas sec. 554, at 624 (1958).) A nonexecutive interest usually is employed where a grantor wishes to create fractional mineral interests but wishes to provide that only one person will have the executive and developmental rights in order to facilitate development. (Blass & Richey, *An Analysis of the Rights & Duties of the Holder of the Executive Right*, 41 Miss. L.J. 189, 191 (1970).) As Williams and Meyers point out in their examination of the duty owed by the holder of an executive right to the owner of an interest subject to that right, a duty arises in the exercise of the executive right by virtue of the separation of the executive leasing power from a royalty or nonexecutive interest. Williams & Meyers sec. 339.2, at 201.

We find the observations of Blass and Richey on the duty of the executive with respect to nonexecutive mineral interests illuminating by way of summary:

> "Since the non-executive interests are dependent to such a great extent on the owner of the executive right, the weight of authority (with the possible exception of Louisiana) recognizes that the executive has an implied duty toward the non-executive interests in the exercise of the executive right. This, of course, is in addition to the normal duties which he owes to all other persons, such as to refrain from fraudulent misrepresentations. The owner of the executive right has other duties which arise through the relation which has been created by a

reservation or granting of the exclusive right to lease. The main controversy has centered around the nature of the duty, if any, and this has not been established with certainty in the cases. \*\*\*

The suggested standard of duty for the executive has varied among (1) the fiduciary responsibility of a trustee; (2) the duty of 'utmost fair dealing'; (3) that of ordinary care and good faith, generally considered to be a contractual, rather than a fiduciary, standard of conduct. The Texas courts have favored the standard of utmost fair dealing, which is said to fall between a high fiduciary duty and a low standard of ordinary care and good faith. This view has been endorsed by a leading writer, Lee Jones, Jr.

Williams and Meyers interpret this standard as 'an ordinary, prudent landowner test. The executive is required to exercise his exclusive leasing power in the same manner as an ordinary, prudent landowner would exercise the leasing power inherent in the mineral fee. The executive's conduct will be judged by such standard, as if no royalty or non-executive mineral interest were outstanding' " (Blass & Richey, *An Analysis of the Rights & Duties of the Holder of the Executive Right*, 41 Miss. L.J. 189, 224-26 (1970).)

We notice that Louisiana's position, which appears not to impose such a duty, has been criticized in Note, *Implied Duties & the Executive Right*, 30 Louisiana L. Rev. 139 (1969).

Writing when the law on the subject was said by the author to be in the formative stage, Lee Jones, Jr., in *Non-Participating Royalty*, 26 Texas L. Rev. 569, 573-74 (1948), concluded that the strict fiduciary standard applicable to trustees and agents was inapplicable to the holder of the exclusive leasing privilege:

"Some of the cases indicate that a fiduciary standard of conduct will be required on the theory that the relation of principal and agent or trustee and *cestui que* trust exists. \*\*\* To apply the strict fiduciary standard applicable to trustees or agents would do violence to the intention of the parties and to the accepted trust and agency concepts. On the other hand, there is ample basis for the recognition of implied covenants. The parties to a non-participating royalty grant or reservation do not contemplate or intend the imposition of the extremely strict *fiduciary* standard of conduct. However, it will be demonstrated that the royalty owner will not be fully protected if he must rely entirely upon the ordinary principles of contract law re-

quiring only *ordinary* good faith, prudence, and diligence. It is believed that the courts will arrive at a compromise between the two extremes and develop a concept which will, to some extent, partake of both theories, and, while recognizing certain implied covenants, will require a standard of conduct in the satisfaction thereof which will approach, but not reach, the strict fiduciary standard. *It is this sense that the phrase,* 'utmost fair dealing,' *is used herein to denote the standard of conduct required to satisfy the various implied covenants.*"

Perhaps the leading case defining the duty owed by the holder of an executive interest to the owner of, in that case, a nonparticipating royalty is *Federal Land Bank v. United States* (U.S. Ct. U. 1958), 168 F. Supp. 788, 790-91, in which the court reasoned:

"It seems clear that the courts will not leave the royalty owners completely at the mercy of the holder of the exclusive leasing power; however, the Texas law is not clear as to what rights the owner of a royalty interest has in these circumstances. \*\*\*

We believe as between the mineral fee owner and the royalty owner there is an implied covenant in the deed that the mineral fee owner will use the utmost fair dealing and diligence in obtaining lease agreements in order to protect the royalty owner's interest.

What then would be 'utmost fair dealing and diligence' in the circumstances of this case? We are of the opinion that the court should require the same degree of diligence and discretion on the part of the mineral fee holder as would be expected of the average land owner who because of self-interest is normally willing to take affirmative steps to cooperate with a prospective lessee."

Of the standard espoused in *Federal Land Bank*, Williams and Meyers conclude:

"This standard, it seems to us, comes down to an ordinary, prudent landowner test. The executive is required to exercise his exclusive leasing power in the same manner as an ordinary prudent landowner would exercise the leasing power inherent in the mineral fee. The executive's conduct will be judged by such standard, as if no royalty or nonexecutive mineral interest were outstanding. Where the interests of the executive and the nonexecutive coincide, the failure to exercise the executive right or the improper exercise thereof due to carelessness, inattention, indifference or bad faith will result in liability. Where

750

the interests of the executive and nonexecutive diverge, the executive will not be bound to a standard of selfless conduct, such as that imposed on trustees or guardians. He may exercise the executive right with the same self-interest in mind as if there were no outstanding royalty or nonexecutive mineral interest. *But the executive cannot exercise (or refuse to exercise) the executive right for the purpose of* extinguishing the nonexecutive interest or for the purpose of *benefiting himself at the expense of the nonexecutive.* If the conduct of the executive satisfies the ordinary, prudent landowner standard, the fact that the nonexecutive owner has been harmed is not actionable under this view. But if an ordinary, prudent landowner, not burdened by an outstanding nonexecutive interest, would have acted differently, then the executive's conduct is actionable if it causes harm. *We believe this standard fairly effectuates the intent of the parties: it does not require more than can be expected of ordinary landowners and it does not permit less, especially where the 'less' is due to the executive's effort to profit at the expense of the royalty or nonexecutive mineral owner."* (Emphasis added.) (Williams & Meyers sec. 339.2, at 209-10.)

Recently, in *J.M. Huber Corp. v. Square Enterprises, Inc.* (Tenn. App. 1982), 645 S.W.2d 410, Tennessee adopted the "ordinary prudent landowner" test enunciated by Williams and Meyers as the standard to which an executive or mineral fee owner must conform.

As the standard appropriate to govern the exercise of the executive right, we adopt that of "utmost fair dealing" and the amplification provided by Williams and Meyers as applicable in Illinois.

■ As to whether the defendant breached the duty of utmost fair dealing to the plaintiff, we note initially that the trial court expressly and unequivocally concluded that the overriding royalty was to be compensation for execution of the lease and not for damages to the surface. The defendant does not suggest that the trial court's findings are against the manifest weight of the evidence. Inasmuch as the defendant obtained the overriding royalty as compensation for executing the lease, by appropriating the entire overriding royalty the defendant unquestionably exercised the executive right for the purpose of benefiting himself at the expense of the nonexecutive and, hence, breached his duty of utmost fair dealing to the plaintiff. As an ordinary landowner, he could have been expected to give plaintiff that portion of the override which was shown to be otherwise available to her and not to have arranged on the sly to have the entire sum funneled into his own coffers.

■ Defendant maintains, on the basis of *Manges v. Guerra* (Tex. 1984), 673 S.W.2d 180, that the trial court erred in cancelling and rescinding the defendant's executive right. In *Manges*, however, the plaintiffs had elected not to rescind the transfer of executive rights but to take damages as found by a jury instead. There is no such waiver here. Defendant argues that to void his executive right would "render the executive right in this state so uncertain as to make it virtually useless." We consider the argument without merit.

Inasmuch as the cancellation was prospective only, we think the measure was consistent with the award of damages and appropriate as a means to protect the plaintiff in the future.

Affirmed.

KARNS and KASSERMAN, JJ., concur.