IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 13, 2022 Session

## WILLIAM LEE RUNION, JR. v. DIANNA LYNN MASHBURN RUNION

**Appeal from the Chancery Court for Washington County**
**No. 19-DM-0322     John C. Rambo, Chancellor**

_____

**No. E2021-00544-COA-R3-CV**
_____

William Lee Runion, Jr. ("Husband") filed for divorce from his wife of many years, Dianna Lynn Mashburn Runion ("Wife"), in 2019.  Throughout the parties' marriage they lived on a farm owned by Husband's father.  When dividing the parties' marital estate, the trial court determined that Wife had no interest in the farm land, the real estate thereon, or the profits generated by the farm.  The trial court found that these were neither separate nor marital assets, as they belonged solely to Husband's father.  Wife appeals, arguing that Husband and Grandfather were engaged in an implied partnership.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellant, Dianna Lynn Mashburn Runion.

Sarah Shults, Erwin, Tennessee, for the appellee, William Lee Runion, Jr.

## OPINION

## BACKGROUND

Husband filed for divorce from Wife on April 30, 2019, in the Chancery Court for Washington County (the "trial court").  The parties married in 1991 and had three children, only one of whom was still a minor at the time of separation.  As grounds for divorce, Husband alleged irreconcilable differences.  Wife counter-petitioned for divorce alleging irreconcilable differences, inappropriate marital conduct, and adultery.

For most of their marriage, the parties lived in a house in Limestone, Tennessee, that was owned by Husband's father, Bill Runion, Sr. ("Grandfather"). The house sits on what the parties refer to as the "Ray Peterson Farm," which is one of several large farms owned by Grandfather in that area. Grandfather paid for the house to be remodeled prior to the parties moving in. While the parties took care of the Ray Peterson house throughout their marriage, for instance through landscaping and adding a swimming pool, the house has always been titled in Grandfather's name, and Grandfather pays the taxes and insurance on the home. The parties maintained renter's insurance.

Husband became a large animal veterinarian in the nineties; however, he was not making much money in this field and went to work for Grandfather in the early 2000s. In return for living rent-free in Grandfather's house, the parties, particularly Husband, helped with Grandfather's numerous properties (collectively, "the Farms"). Husband tended to Grandfather's cattle herd, among other responsibilities. In the beginning, Husband was paid fifteen dollars per hour and was issued W-2s. In approximately 2010, however, Husband assumed more responsibility on the Farms, and his role effectively changed to farm manager. This change occurred because the long-time farm manager was getting older and suffered an injury to his hand. Once Husband assumed the role of farm manager, Husband began receiving profits from the Farms and covered some farm expenses out of his own pocket.

In addition to the animals' veterinary needs, Husband managed several rental properties situated on the Farms. All of these properties are owned by Grandfather, and Grandfather paid the taxes and insurance. Husband found tenants for the rentals, took care of the lease agreements, and collected the rent. He and Wife also did small repairs and renovations on the properties, including things like painting, replacing cabinets and countertops, and replacing HVAC units. If a project was any larger or more expensive than, for example, an HVAC unit, Grandfather would approve and pay for it. Additionally, significant decisions, such as when to sell or renovate rental properties, were left to Grandfather. In exchange for managing the properties, Grandfather allowed Husband to keep the rent money he collected. The rental property income was one of the parties' primary sources of income.

Likewise, Grandfather allowed Husband to grow hay and alfalfa on Grandfather's land, sell the hay, and keep the profits. Husband was responsible for expenses such as fertilizing the crops and paying laborers. Most of the large farming equipment used in this endeavor was owned by Grandfather. Sometimes, Grandfather would allow Husband to take an older piece of equipment and trade it in for something newer. Wife and the parties' children would occasionally help with the hay. Hay sales were another component of the parties' income, although not all of that income was reported.

Another income source for the parties was the cattle operation. Before Husband became farm manager, Grandfather maintained a herd of cattle with three to four hundred

heads.  Grandfather made the initial investment in acquiring the herd and always insured it.  As farm manager, Husband implemented what the parties refer to as the "replacement program."  Prior to this, Grandfather had been purchasing replacement cows for breeding.  According to Husband, this caused the herd as a whole to be older and less profitable.  Husband helped implement a program in which he and Grandfather bred and raised the replacement cows on their own; they would separate the heifers[1] from the older cows and then breed the heifers with bull cows.  When the resultant cattle were sold, Husband and Grandfather would share the profits, or Husband would keep them.  The cattle operation was profitable; one year, Husband earned approximately $71,000.00 from cattle sales.  By all accounts, however, the cattle market had declined by the time of trial.  Grandfather characterized the cattle born of the replacement program as he and Husband's "joint property."  Husband testified, however, that the only cattle he owned were the bull cows, because he and Wife had purchased them with marital funds.  Husband characterized the cattle herd at large as being owned by Grandfather and testified that the size of the herd was essentially the same as it was when Husband implemented the program.  Husband conceded that Grandfather allowed the parties to profit from the replacement and breeding program.  By the time of trial, there were about five bull cows in the herd, although this number had fluctuated throughout the years.

It is also undisputed that Husband used marital funds towards the Farms, despite the fact that Grandfather owned all of the land and the homes thereon.  For instance, Husband testified at trial that farm supplies such as chemicals, fertilizer, and animal medications were often purchased by Husband out of marital funds.  Husband would use the rent money he collected from the rental properties not only as the parties' personal income, but also to pay laborers in cash for other work around the Farms.  In addition to the joint checking account used by the parties, Husband maintained a bank account for farm expenses.  Husband sometimes transferred money between these accounts.  For example, one year the parties received an eight-thousand-dollar tax return that Husband deposited into the farm account.  He would sometimes pay the children's credit card bills out of the farm account.  Wife did not have access to the farm account.

Wife had little to no involvement in the parties' finances.  Wife testified that she paid bills on one occasion early in the parties' marriage and that this angered Husband.  After that point, Wife was not involved in any of the parties' finances and largely assumed that Husband was taking care of everything.  Wife knew that marital funds were being used for farm expenses but was under the impression that the Farms and the income therefrom were the parties' retirement.  Wife worked part-time as a nurse at some points during the marriage and took care of the parties' three daughters.  When Wife had income from nursing, it was contributed to family expenses.  It is undisputed that tax withholding from Wife's paychecks helped the family financially.

---

[1] Husband testified that a heifer is a cow that has not yet produced a calf.

Throughout the marriage, many of the parties' expenses were paid by Grandfather. Grandfather paid the taxes and insurance on the parties' home, provided the parties and their children with vehicles, gave the parties an RV, contributed to the children's college tuition, and consistently gave the parties large cash gifts throughout the years. Husband testified that Grandfather's support was vital, and Husband's financial experts agreed. Grandfather also testified at trial that he contributed to the installation of the parties' inground pool at the Ray Peterson house, although the full extent of the contribution is unclear from the record. Additionally, Grandfather gifted Husband and Husband's sister land in North Carolina and purchased a condo in Johnson City, Tennessee, so the parties' children had a place to live during college. This behavior was not atypical for Grandfather. Other farm employees, such as a long-time employee named Rigo, lived in homes owned by Grandfather rent-free. Husband characterized this arrangement as part of the employment "package." Wife's parents also lived rent-free in a home owned by Grandfather on the Ray Peterson farm not far from the parties. Wife's father worked on the Farms. Grandfather also paid for several other family members' educations and was, by all accounts, extremely generous with his family.

Based on the arrangements between Husband and Grandfather, Wife's position throughout the divorce was that the parties had an interest in the rental property, the marital home on the Ray Peterson farm, the livestock, the farm equipment, and the farm business generally. Wife took great issue with the use of marital funds in keeping up the Farms and characterized Husband's use of marital funds in improving Grandfather's property as dissipation of marital assets. On the other hand, however, Wife also claimed that she had an interest in the Farms as a result of same.

Accordingly, categorization and division of the parties' assets was the primary issue at trial, which was held over several days in August and September of 2020. The trial court heard from several witnesses including the parties and two of their children, Grandfather, other relative and friends, and several accountants and tax specialists.

One witness, Todd Love, who was designated an expert in small farming operations in Upper East Tennessee, testified about the various arrangements parties often have in farming. Mr. Love explained that there are many ways to have a "farm lease," and explained that these agreements are most often done by handshake as opposed to a formal written contract. Mr. Love testified that he also grows hay on Grandfather's land and shares the profits with Grandfather. Mr. Love indicated that equipment sharing is common in these endeavors and that if he is using someone else's equipment and it breaks, the right thing to do is to repair it. On the other hand, Mr. Love testified that he was unsure about whether it is normal for a farm manager to invest his or her own money into farm operations. Overall, however, Mr. Love maintained that farming on someone else's land is not uncommon and that the lease arrangements are often informal; frequently, it benefits the landowner to have someone taking care of his or her land if it is not otherwise being used.

Both parties also provided financial experts. Ken Lewis, Husband's accountant, testified *inter alia* regarding Husband's income and the tax ramifications of Husband's arrangement with Grandfather. According to Mr. Lewis, Husband claimed farm and rental property expenses such as feed and labor on his taxes, and he explained that it is not necessary to own rental property in order to claim expenses therefrom. As another example, Mr. Lewis noted that Husband would write off the family's phone bill as a farm expense, but he explained that this is appropriate only when the phones are being used for farm purposes. Husband would also depreciate farm equipment that belonged to or was purchased by Grandfather, which Mr. Lewis testified is important in farming.

Husband also presented evidence from his forensic accountant, Robert Gibson, who opined that the profit margins for the Farms were tight and that the farm expenses were nearly as high as the revenue being generated. Having reviewed several years' worth of financial information, Mr. Gibson determined that the parties were financially dependent upon Grandfather through both the regular cash gifts and the rental income Grandfather allowed the parties to keep. The rental property income, in particular, allowed the parties to make ends meet and pay their credit card bills every month. Mr. Gibson considered this the parties investing their money in a business. The profit margins on the Farms became even tighter as Husband began assuming responsibility for more of the everyday farm expenses, some of which Mr. Gibson confirmed were paid out of the parties' joint checking account. Some years, income from the Farms resulted in no profits or very little profit; for instance, Mr. Gibson testified that in 2017, the parties' net income was $12,570.00. Mr. Gibson also explained that Wife having income withheld from her nursing paychecks helped the family tax-wise and that based on Husband's banking records, he was bringing in more cash than was reflected on his reported tax income.

Wife's expert witness, CPA Chris Ideker, took the position that the Farms constituted a closely held family business, specifically, a partnership. Mr. Ideker suggested that the arrangement between Husband and Grandfather was atypical because Husband was essentially taking one hundred percent of the profits from the Farms and then reinvesting them back into the business. Rather than looking at form, Mr. Ideker testified that he evaluated the situation for its "economic substance," noting that Husband operated as if he owned the entire cattle herd and the hay sale proceeds outright. While Mr. Ideker agreed that Grandfather owned all of the land and rental properties, he opined that the parties' behavior was very unusual for people who did not actually have an interest in the land and properties. For example, Mr. Ideker testified regarding the rental properties, that Husband and Wife "incurred expenses . . . typically associated with ownership and management." Mr. Ideker characterized the rental property arrangement as a property management business and proposed that it should be valued by averaging the amount of rent income collected per month. Mr. Ideker conceded, however, that his valuation of the rental property management business depended upon the assumption that Grandfather would continue to allow Husband and Wife to operate in the same manner.

The trial court was tasked with determining what interest, if any, Wife had in the Farms. The trial court's findings of fact and conclusions of law were, as relevant:[2]

All of [the Farms] are deeded in [Grandfather's] name. They are neither the separate property of the husband nor marital property of this couple. Further, [Grandfather] was not a party to this lawsuit. [Grandfather] has not gifted any of his farms to his son or daughter-in-law.

[Husband] manages several farms owned by his father. As part of his farm management, [Husband] implemented a cattle replacement program for the herd already owned by [Grandfather]. This program replaces the older cows with the most-promising heifers in the herd. To implement the program, [Husband and Wife] would buy the bulls and would rotate them every three to four years. [Grandfather] continued to own the rest of the herd (the calves, heifers, steers and cows).

[Grandfather] and [Husband] sell calves during the spring from April to May and in the fall—usually around October or November. Calves are usually sold when they weigh between 400 to 450 pounds. The bull calves are sold along with approximately three-quarters of the heifer calves. The other quarter of the heifer calves are kept as replacements for the older or less desirable cows that are culled from the herd. Based on persuasive testimony, the Court finds there are 396 beef cattle at [Grandfather's] farms.

The Court finds that except for the bulls, the balance of the herd is owned by [Grandfather]. He has insured the herd since 2008. He owned all of the cattle before the replacement program. Only one-fourth of the calves are retained by [Grandfather] and [Husband] to replace the cows; essentially, the proceeds from the sale of the rest of the cattle were given to [Husband] or the proceeds from the sale of the cattle were split between [Grandfather] and the couple. [Grandfather] always received heifers to replace his culled cows. Accordingly, the size of [Grandfather's] cattle herd has remained stable. [Grandfather] has paid or gifted his son the balance of calves to compensate him for his work on the farm, but the herd has remained intact under the ownership of [Grandfather]. The Court was persuaded by the testimony of [Grandfather] in this regard. [Grandfather] never sold his herd to his son. He has maintained ownership and he replaced his old cows with the portion of heifer calves he retained.

The couple owns five bulls now, and they are marital property worth

---

[2] On appeal, Wife's argument centers primarily on the cattle replacement program profits, the hay sales, and the rental properties. In the interest of brevity, we focus our discussion on these issues.

$12,500. Husband's father allows him to receive some of the income from selling cattle, but the father claims ownership of them. [Grandfather] owns the herd, except for the five bulls. He pays for the insurance policy that covers the herd. [Grandfather] compensates his son for working at the farm and managing the herd by allowing him to receive some of the money from the periodic sale of a portion of the herd. What he has not done is gifted the herd to his son, as the gifts or payment by receipt of cattle sale proceeds occurs at the time the cattle are actually sold. The breeding of the cattle by the couple's bulls did not persuade the Court that the resulting offspring became the marital property of the couple.

\*       \*       \*

There was no persuasive testimony that the farms' inventory of hay, straw or alfalfa is marital property. [Grandfather] allows his son to earn money from the sale of hay harvested from [Grandfather's] farms. This further highlights the arrangement between [Grandfather] and [Husband] that financially benefits [Husband].

\*       \*       \*

As to the farm operations, [Grandfather] has turned over the operation of the farm to his son. [Husband] has been managing the farms since 2010. He has not deeded any land to the couple. When the farms are sold, [Husband] does not receive payment from the sale of land. In exchange for [Husband] vaccinating, caring for the cattle, managing the cattle, providing the oversite and labor to harvest hay, [Grandfather] has generously allowed [Husband] to keep proceeds from cattle sales not related to maintaining the herd. In other ways, [Grandfather] subsidizes his son. He will allow [Husband] to trade his farm equipment for new farm equipment. The son depreciates the new equipment.

Wife asserted that marital funds have been spent on [Grandfather's] property, whom she does not particularly like. This includes three HVAC units installed in rental homes. They are worth $4,500. As to the rental properties, [Grandfather] pays for the major renovations while the smaller expenses are paid from the rental income and collected by [Husband]. The parties disputed the significance of the investments the couple have made into the rental properties. [Wife] asserts this activity and course of conduct indicates the couple own a rental business that her expert valued at $606,904. [Husband] denies a marital rental business exists.

There was no dissipation of marital assets by investing money in

[Grandfather's] property. The money spent did not add significantly to the value of the homes but were more associated with general maintenance and upkeep. The couple used [Grandfather's] assets to earn income for them. Frankly, they received far more money in rental income from [Grandfather's] property than what they spent on his properties.

Marital funds were not spent subsidizing or enhancing the estate of [Grandfather]. Rather, they were minimal expenses related to the management of rental properties and the farm, and [Grandfather] allowed his son and daughter-in-law to receive the benefit of the farms and the rental homes located on them. It was simply part of their arrangement that they would expend some of their labor and a minimal amount of their money in managing the rental properties and in return they received all of the rental income. This was an expense of business and the expenditure of these minimum expenses greatly benefited the couple in supplementing their income.

Finally, their investment of labor and money was not to enhance the properties of their father for a future expected inheritance; rather, it was simply sharing of some of the expenses when they benefited from all of the income. They were essentially property managers for [Grandfather]. They did not have a business, they had jobs working for [Grandfather].

Consequently, the trial court rejected Wife's position that she had an interest in the Farms or the revenue therefrom. Wife filed a timely notice of appeal to this Court.

## ISSUES

Wife raises a single issue on appeal, which is taken verbatim from her principal brief:

> I.     When an ongoing business exists that was created during the marriage, that business must be classified as marital property and a value assigned to it. The trial court erred in failing to give credence to the undisputed evidence of a farming business involving [Grandfather] and [Husband] and in not assigning a value to the business interest demonstrated to exist by undisputed proof.

Husband raises the additional issue of whether he should be awarded his attorney's fees incurred on appeal.

- 8 -

## STANDARD OF REVIEW

This case was decided by the trial court sitting without a jury. Accordingly, we review the trial court's findings of fact de novo presuming the findings are correct unless the preponderance of the evidence is otherwise. *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000); Tenn. R. App. P. 13(d). The trial court's legal conclusions, however, are reviewed de novo with no presumption of correctness. *T.R. Mills Contractors, Inc. v. WRH Enter., LLC*, 93 S.W.3d 861, 864 (Tenn. Ct. App. 2002) (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)).

## DISCUSSION

The question in this case is whether an implied partnership exists between Husband and Grandfather. Wife argues that Husband and Grandfather had a farming business and that because Husband should be considered a partner by implication, his interest in that business is a marital asset that should have been assigned value and divided equitably.

Tennessee Code Annotated section 61-1-202(a) provides that "the association of two (2) or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." While receiving a share of business profits creates the presumption of a partnership, this presumption may be rebutted if the profits were received as payment for "services as an independent contractor or of wages or other compensation to an employee[,]" or as rent. *Id.* § 61-1-202(c)(3); *see also Finch v. Raymer*, No. W2012-00974-COA-R3-CV, 2013 WL 1896323, at *9 (Tenn. Ct. App. May 6, 2013) (noting that "sharing of profits creates a rebuttable presumption of a partnership[,]" but also that "the statute contains several exceptions to this rule").

The party claiming an implied partnership must prove its existence by clear and convincing evidence. *Tanner v. Whiteco, L.P.*, 337 S.W.3d 792, 798 (Tenn. Ct. App. 2010) (citing *Mullins v. Evans*, 308 S.W.2d 494, 498 (1957)). To meet the clear and convincing standard, the evidence must eliminate "serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). The "evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established." *In re Estate of Threefoot*, No. W2005-02942-COA-R3-CV, 2006 WL 3114147, at *6 (Tenn. Ct. App. Nov. 3, 2006) (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995)). The clear and convincing standard is more exacting than the preponderance of the evidence standard and requires the evidence to demonstrate "that the truth of the facts asserted is 'highly probable.'" *Id.* at *6 (citing *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977)). What amounts to a partnership is a question of law, but whether a partnership exists "under conflicting evidence" is a question of fact. *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 605 (Tenn. Ct. App. 2001).

Our Supreme Court created the following test for the existence of an implied partnership:

> [T]he existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown*, 39 Tenn. App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. *Wyatt*, 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts*, 779 S.W.2d at 795–96. It is the intent to do the things which constitute a partnership that determines whether the individuals are partners, regardless if it is their purpose to create or avoid the relationship. *Wyatt*, 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience or money.

*Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn. 1991) (footnote omitted). The question presented in *Bass* was whether a married and then divorced couple was in an implied partnership. *Id.* at 39. Mr. Bass purchased a restaurant where Ms. Bass initially worked "17 hour days taking orders, cooking meals, cleaning, and running the cash register." *Id.* at 40. Eventually, both Mr. and Ms. Bass worked together at the restaurant, each working twelve hour shifts so the restaurant could be open twenty-four hours a day. *Id.* Ms. Bass did not receive compensation for this work. *Id.* Additionally, Mr. Bass began a "video amusement game business," in which Ms. Bass worked after the restaurant building burned down. *Id.* Once again, she was not compensated for her work, which included "daily servicing of the video machines, [helping] decide where new machines should be located, and [keeping] most of the records of the various businesses," as well as writing the checks and collecting money from the machines. *Id.* Considering Ms. Bass's financial, time, and labor investments into both the restaurant and the video game business, our Supreme Court found that Mr. and Ms. Bass formed an implied business partnership for each entity. *Id.* Ms. Bass was thus entitled to one-half ownership of all partnership assets, including assets purchased with partnership assets. *Id.* at 38.

The alleged implied partnership in this case is a farming business between Husband and Grandfather. This Court considered an implied partnership in the context of farming in *Swecker v. Swecker*, 360 S.W.3d 422 (Tenn. Ct. App. 2011), in which a son and his wife

- 10 -

jointly claimed the existence of an implied partnership between the son and his father. *Id.* at 424. The father and son operated a dairy farm on the father's land, but the cattle were registered jointly, checks for the sale of milk were issued to both parties, and the parties owned a joint bank account. The court found an implied partnership because the father "contributed his experience and the assets and ongoing business of the already-established dairy," and the son "contributed his labor, skill, and his own personal resources to the dairy operation, by working in it daily, paying bills for the dairy out of his own personal funds and contributing the use of his personal equipment to the dairy." The son "took care of the dairy full-time with little or no input from his father." Accordingly, the son in *Swecker* was able to prove, by clear and convincing evidence, an implied partnership with his father.

While *Swecker* is similar to the present case at first blush, there are important distinctions. *See Bass*, 814 S.W.2d at 41 (noting that with implied partnerships, "each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties"). First, in *Swecker*, the son, who spent a substantial amount of his own time and resources on the dairy farm, was one of the parties alleging an implied partnership. In this case, Wife, a third party to the relationship between Husband and Father, is alleging the existence of an implied partnership between two people who deny its existence. While there is some suggestion of Wife helping around the Farms, the record does not show that Wife herself worked on the Farms consistently or was heavily involved in their management; rather, Wife would occasionally help Husband if he asked for it. Most of the time, Wife worked as a nurse or as a stay-at-home caretaker of the parties' children. Moreover, Wife does not argue in her brief that *she* is an implied partner in the farming business, but instead frames the issue as whether Husband and Grandfather have an implied partnership, all while Husband and Grandfather maintain that Husband worked for Grandfather. As such, Wife's position is more attenuated from the purported business than the son was in *Swecker*.

Further, the relationship between Grandfather and Husband here is different from that of the father and son in *Swecker*, in the sense that Grandfather treated Husband like an employee in several ways, and Grandfather very much retained control of the farming operations at large.

Several important facts support the trial court's conclusion that Husband was an employee of Grandfather's as opposed to a partner. Husband was clearly brought on as an employee in in the early 2000s; at that time, he was paid fifteen dollars an hour and received W-2s from Grandfather. From the beginning, then, it was understood that Husband was an employee of Grandfather's, notwithstanding the fact that the manner in which Husband was compensated changed over time. *See* Tenn. Code Ann. § 61-1-202(c)(3) (providing that while a person who receives a share of the profits is presumed to be a partner, this presumption is inapplicable if the person receives profits as a payment of, *inter alia*, wages or compensation as an employee). That Grandfather began sharing profits with Husband, as opposed to paying him an hourly rate, makes sense in light of the fact that Husband

undisputedly took on more responsibility around the Farms in approximately 2010, when the long-time farm manager retired.

Grandfather had an established pattern of compensating his employees in non-traditional ways. Grandfather's long-time farm worker, Rigo, also lived with his family in a home owned by Grandfather on Grandfather's land. Thus, one way in which Grandfather compensated Rigo was by providing him a place to live, and, according to Husband, this arrangement was part of Rigo's "employment package." Grandfather and Husband also helped Rigo obtain his citizenship. The same goes for Wife's father, Mr. Mashburn, who also helped on the Farms and lived rent-free with his wife in one of Grandfather's houses. Like the parties, Mr. and Mrs. Mashburn chose to put some of their own money towards fixing up the house in which they lived. Accordingly, Mr. and Mrs. Mashburn also contributed some of their own money towards a farm asset, the trade-off being that they lived for free next to their daughter and grandchildren. In determining whether Husband is a partner, we consider all relevant facts, including the conduct of the parties. *Bass*, 814 S.W.2d at 41 (citing *Roberts v. Lebanon Appliance Serv. Co.*, 779 S.W.2d 793, 795 (Tenn. 1989)). And here, Grandfather's conduct towards Husband was similar to his conduct towards other employees.

While Grandfather was certainly more generous with Husband given their close relationship, Grandfather's arrangement with him was similar to that of other farm employees. It is also worth noting that, according to small farming operations expert Mr. Love, informal compensation structures are not uncommon in the farming industry, especially those arrangements involving family. Again, we bear in mind that these types of cases must be decided on a case by case basis, and no one fact is conclusive or dispositive. *Bass*, 814 S.W.2d at 41.

Also distinguishing this case from *Swecker* is the level of control Grandfather maintained over the Farms. In *Swecker*, the son was brought into the dairy farming business to "manage all aspects" of the operation, with "little to no input from his father." 360 S.W.3d at 426. Also, in that case, the father took steps to jointly title important farm assets in his son's name; for example, the father registered the cattle herd under both his and his son's names. Insofar as the farm at issue in *Swecker* was a dairy farm, the cattle herd was an important asset.

The same cannot be said here. Undeniably, Husband gained more responsibility when he took on the role of farm manager in 2010. Husband's duties included tending to the veterinary needs of the animals, managing the rental properties and the tenants, and growing hay and alfalfa. However, the testimony at trial established that while Husband oversaw much of the day-to-day operations of the farm, Grandfather was involved, and in fact retained significant decision-making power. It cannot be said that Husband was allowed to run the Farms with "little to no input from [Grandfather]." *Swecker*, 360 S.W.3d at 426. Additionally, Grandfather owned all of the farm land, most of the farming

- 12 -

equipment, the cattle herd aside from a few bulls, and all of the homes sitting on the farm land, including the marital home. While Husband certainly had access to these things, there is no dispute that Grandfather always owned and insured them. Stated differently, Grandfather assumed essentially all of the risk in the farming endeavors. Wife presented no evidence that Grandfather was taking steps, as the father in *Swecker* was, to jointly title the farm assets as Husband's or treated them as Husband's. Indeed, Husband and Wife lived in the marital home for decades, and Grandfather continued to insure it and pay the taxes, with no discussion of titling it in Husband's name. Although we acknowledge that Husband's lack of ownership of farm assets is not dispositive,[3] it is significant when considering Husband's and Grandfather's respective roles on the Farms and the totality of how Grandfather treated Husband.

Additionally, Grandfather decided when rental properties should be sold or updated. He also paid for the larger expenses on the rental properties. Husband testified that anything costing more than a few thousand dollars would be approved and paid for by Grandfather. The most significant update to the rental property paid for by Husband was some new HVAC units. Grandfather also directed Husband on when to exchange old farm equipment for new farm equipment and determined how profits from the farming business would be divided. Although Husband was responsible for the day-to-day management of the Farms, it was understood by those involved that Grandfather was the boss. Husband and Grandfather agreed at trial that Grandfather had the final word regarding the Farms.

On appeal, Wife focuses on three aspects of the Farms that purportedly amount to an implied partnership between Husband and Grandfather: the cattle herd, the hay and alfalfa grown by Husband on Grandfather's land, and the rental properties. Turning first to the cattle operation, Wife urges that the combination of the parties' jointly-owned bulls with Grandfather's cows is a "quintessential combination of valuable assets made to produce a profit for the persons involved." We agree that the cattle operation amounts to a combination of property and labor to produce a profit. *Bass*, 814 S.W.2d at 41. Nonetheless, the combination of assets to produce a profit is not dispositive evidence of a partnership, particularly when there is evidence that the profit sharing was in exchange for "wages or other compensation to an employee." Tenn. Code Ann. § 61-1-202(c)(3)(B).

The trial court found such an exchange, noting that "[Grandfather] compensates his son for working at the farm and managing the herd by allowing him to receive some of the money from the periodic sale of a portion of the herd." The record preponderates in favor of this finding. It is undisputed that aside from five bull cows, Grandfather is sole owner

---

[3] *See Finch v. Raymer*, No. W2012-00974-COA-R3-CV, 2013 WL 1896323, at *10 (Tenn. Ct. App. May 6, 2013) ("[R]eal property owned by a partnership may be held either in the partnership's name or in the name of one or more of the partners, and so 'the record title of a piece of property does not necessarily reveal whether the property belongs to the owners of record or to a partnership of which the owners of record are members.'" (quoting *Leckrone v. Walker*, No. M1998-00974-COA-R3-CV, 2002 WL 773147, at *3 (Tenn. Ct. App. Apr. 30, 2002))).

of the cattle herd. It is registered and insured in his name. As the Farm's veterinarian, Husband tended to the cattle and kept them up to date on medications and vaccinations, and after 2010, Husband was not paid a salary or an hourly wage for this work. Rather, Husband and Grandfather both characterized the money from the cattle sales as Husband's compensation for his work on the Farms. Importantly, the record establishes that Grandfather could have put a stop to this at any point and instead pay Husband a salary or by the hour.

Wife also argues that Husband using Grandfather's equipment to grow hay and alfalfa creates an implied partnership. Whatever presumption of an implied partnership may have arisen from the sharing of hay operation profits, however, was successfully rebutted by Mr. Love's testimony about the farming industry. *See Finch*, 2013 WL 1896323, at *9 n.12. Indeed, the nature of this operation within the larger farming context is important. According to Mr. Love, informal business arrangements are common between farmers, as is equipment sharing. It is also extremely common to grow crops on someone else's land, and the owner may or may not charge rent for the use of the land. According to Mr. Love, this is done because it benefits the landowner to have the land tended to. The tradeoff is that the person growing the crops takes care of the land, perhaps keeps up with the fences, and will repair borrowed equipment if it breaks or needs maintenance. Importantly, Mr. Love also testified that sometimes a landowner will not charge rent to another farmer but will take a percentage of the profits from the sale of the farmer's crops. *See* Tenn. Code Ann. § 61-1-202(c)(3)(C). These arrangements are informal, almost always done by handshake, without a written lease, and through cash payments.

By way of example, Mr. Love, like Husband, grows hay on Grandfather's land and shares the profits with Grandfather. The shared profits between Mr. Love and Grandfather are akin to Mr. Love paying Grandfather rent for the use of his land—one of the arrangements that can rebut the presumption of a partnership. *See id.* Again, Grandfather's conduct towards other people, including those outside the family, was similar to his dealings with Husband.

While Grandfather does allow Husband to keep the profits from the sale of alfalfa and hay, this is reflective both of Grandfather's generosity and of Husband's duties as the farm manager. Stated differently, the arrangement regarding the hay and alfalfa could be seen two ways. First, as Grandfather renting his land to Husband for free or for a reduced rate. Second, as compensation for Husband tending to the land as farm manager. Either way, any presumption of a partnership created by this arrangement was rebutted. *See id.* § 61-1-202(c)(3)(B)–(C); *see also Finch*, 2013 WL 1896323, at *9 n. 12.

Finally, Wife argues that she and Husband had, essentially, a property management business together that consisted of the monthly rent from Grandfather's various tenants. It is true that Husband managed Grandfather's rental property; Husband dealt with tenants,

executed lease agreements, and collected rent. Additionally, he and Wife paid for "small repairs and renovations on the properties." In exchange, Grandfather allowed Husband to keep the rental income. Wife categorizes this arrangement as another element of the purported implied partnership. However, Husband's role overseeing the rental properties is akin to his roles managing the herd and crops—Husband shared in the profits from the rental properties as compensation for his role as manager, and Grandfather very much retained control of the rental property.

While the arrangement between Husband and Grandfather could be seen as unusual in the typical business world, it does not constitute a partnership, nor is it unusual in the context of family farming. Husband and Grandfather were not on equal footing when it came to the management of the Farms. Husband's role as farm manager was akin to that of an employee, albeit a well-compensated employee, where he oversaw the day-to-day operation of the Farms, but was always subject to Grandfather's control. The fact that other non-family employees were compensated in similar manners buttresses this conclusion.

Based on all of the foregoing, we conclude that a presumption of an implied partnership arose due to profit sharing but that Husband rebutted the presumption at trial. *See* Tenn. Code Ann. § 61-1-202(c)(3); *see also Finch*, 2013 WL 1896323, at *9 n.12. These cases must be decided not based on one fact or circumstance, or a conclusive test, but rather based "upon consideration of all relevant facts, actions, and conduct of the parties." *Bass*, 814 S.W.2d at 41 (citing *Roberts*, 779 S.W.2d at 795). In this case, all of the relevant circumstances, taken together, established that Husband was treated similarly to other farm employees and family friends. Wife's burden was to establish the existence of an implied partnership by the exacting standard of clear and convincing evidence; we cannot say, however, that the proof before us eliminates "serious or substantial doubt about" whether an implied partnership exists between Husband and Grandfather. *Hodges*, 833 S.W.2d at 901 n.3. Accordingly, Wife did not meet her burden, and the trial court correctly concluded that the Farms and the assets thereon are Grandfather's property, as opposed to marital property subject to division.

Finally, Husband argues that he should be awarded his attorney's fees incurred on appeal. Whether to grant "such an award is within this Court's sole discretion." *Sample v. Sample*, 605 S.W.3d 629, 640 (Tenn. Ct. App. 2018) (citing *Cain-Swope v. Swope*, 523 S.W.3d 79, 100 (Tenn. Ct. App. 2016)). We consider "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal[,] and any other equitable factor that need be considered." *Id.*

Husband was successful in this appeal. Under all of the circumstances, however, he is in a more favorable financial position than Wife. He has the ability to pay his attorney's fees. Exercising our discretion, we decline to award Husband his attorney's fees incurred on appeal.

## CONCLUSION

The judgment of the Chancery Court for Washington County is affirmed. Costs of this appeal are assessed to the appellant, Dianna Lynn Mashburn Runion, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE